FARAGHER *v.* CITY OF BOCA RATON

No. 97–282.   Argued March 25, 1998—Decided June 26, 1998

776

778

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, KENNEDY, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined, *post*, p. 810.

*William R. Amlong* argued the cause for petitioner. With him on the briefs were *Martha F. Davis, Yolanda S. Wu,* and *Eric Schnapper.*

*Irving Gornstein* argued the cause for the United States et al. as *amici curiae* urging reversal. With him on the brief were *Solicitor General Waxman, Acting Assistant Attorney General Lee, Deputy Solicitor General Wallace, C. Gregory Stewart, Carolyn L. Wheeler,* and *Gail S. Coleman.*

*Harry A. Rissetto* argued the cause for respondent. With him on the briefs were *Peter Buscemi, Mark S. Dichter, Mark A. Srere,* and *Victoria E. Houck.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Federation of Labor and Congress of Industrial Organizations by *Jonathan P. Hiatt, Marsha S. Berzon,* and *Laurence Gold;* for the Lawyers' Committee for Civil Rights Under Law et al. by *Marc L. Fleischaker, Jack W. Londen, Norman Redlich, Barbara R. Arnwine, Thomas J. Henderson, Richard T. Seymour, Teresa A. Ferrante,* and *Steven R. Shapiro;* for the National Employment Lawyers Association by *Margaret A. Harris* and *H. Candace Gorman;* and for the National Women's Law Center, Equal Rights Advocates et al. by *Lois G. Williams, Nancy C. Libin, Jane L. Dolkart,* and *Marcia D. Greenberger.*

Briefs of *amici curiae* urging affirmance were filed for the Chamber of Commerce of the United States by *Stephen A. Bokat, Robin S. Conrad,* and *Sussan L. Mahallati;* for the Equal Employment Advisory Council by *Ann Elizabeth Reesman;* for the National Association of Manufacturers et al. by *William J. Kilberg, Douglas R. Cox, Jan S. Amundson,* and

JUSTICE SOUTER delivered the opinion of the Court.

This case calls for identification of the circumstances under which an employer may be held liable under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.*, for the acts of a supervisory employee whose sexual harassment of subordinates has created a hostile work environment amounting to employment discrimination. We hold that an employer is vicariously liable for actionable discrimination caused by a supervisor, but subject to an affirmative defense looking to the reasonableness of the employer's conduct as well as that of a plaintiff victim.

I

Between 1985 and 1990, while attending college, petitioner Beth Ann Faragher worked part time and during the summers as an ocean lifeguard for the Marine Safety Section of the Parks and Recreation Department of respondent, the City of Boca Raton, Florida (City). During this period, Faragher's immediate supervisors were Bill Terry, David Silverman, and Robert Gordon. In June 1990, Faragher resigned.

In 1992, Faragher brought an action against Terry, Silverman, and the City, asserting claims under Title VII, Rev. Stat. § 1979, 42 U. S. C. § 1983, and Florida law. So far as it concerns the Title VII claim, the complaint alleged that Terry and Silverman created a "sexually hostile atmosphere" at the beach by repeatedly subjecting Faragher and other female lifeguards to "uninvited and offensive touching," by making lewd remarks, and by speaking of women in offensive terms. The complaint contained specific allegations that Terry once said that he would never promote a woman to the rank of lieutenant, and that Silverman had said to Faragher, "Date me or clean the toilets for a year." Asserting that

*Quentin Riegal;* and for the Society for Human Resource Management by *Allan H. Weitzman* and *Paul Salvatore.*

Terry and Silverman were agents of the City, and that their conduct amounted to discrimination in the "terms, conditions, and privileges" of her employment, 42 U. S. C. § 2000e–2(a)(1), Faragher sought a judgment against the City for nominal damages, costs, and attorney's fees.

Following a bench trial, the United States District Court for the Southern District of Florida found that throughout Faragher's employment with the City, Terry served as Chief of the Marine Safety Division, with authority to hire new lifeguards (subject to the approval of higher management), to supervise all aspects of the lifeguards' work assignments, to engage in counseling, to deliver oral reprimands, and to make a record of any such discipline. 864 F. Supp. 1552, 1563–1564 (1994). Silverman was a Marine Safety lieutenant from 1985 until June 1989, when he became a captain. Id., at 1555. Gordon began the employment period as a lieutenant and at some point was promoted to the position of training captain. In these positions, Silverman and Gordon were responsible for making the lifeguards' daily assignments, and for supervising their work and fitness training. Id., at 1564.

The lifeguards and supervisors were stationed at the city beach and worked out of the Marine Safety Headquarters, a small one-story building containing an office, a meeting room, and a single, unisex locker room with a shower. Id., at 1556. Their work routine was structured in a "paramilitary configuration," id., at 1564, with a clear chain of command. Lifeguards reported to lieutenants and captains, who reported to Terry. He was supervised by the Recreation Superintendent, who in turn reported to a Director of Parks and Recreation, answerable to the City Manager. Id., at 1555. The lifeguards had no significant contact with higher city officials like the Recreation Superintendent. Id., at 1564.

In February 1986, the City adopted a sexual harassment policy, which it stated in a memorandum from the City Man-

ager addressed to all employees. *Id.*, at 1560. In May 1990, the City revised the policy and reissued a statement of it. *Ibid.* Although the City may actually have circulated the memos and statements to some employees, it completely failed to disseminate its policy among employees of the Marine Safety Section, with the result that Terry, Silverman, Gordon, and many lifeguards were unaware of it. *Ibid.*

From time to time over the course of Faragher's tenure at the Marine Safety Section, between 4 and 6 of the 40 to 50 lifeguards were women. *Id.*, at 1556. During that 5-year period, Terry repeatedly touched the bodies of female employees without invitation, *ibid.*, would put his arm around Faragher, with his hand on her buttocks, *id.*, at 1557, and once made contact with another female lifeguard in a motion of sexual simulation, *id.*, at 1556. He made crudely demeaning references to women generally, *id.*, at 1557, and once commented disparagingly on Faragher's shape, *ibid.* During a job interview with a woman he hired as a lifeguard, Terry said that the female lifeguards had sex with their male counterparts and asked whether she would do the same. *Ibid.*

Silverman behaved in similar ways. He once tackled Faragher and remarked that, but for a physical characteristic he found unattractive, he would readily have had sexual relations with her. *Ibid.* Another time, he pantomimed an act of oral sex. *Ibid.* Within earshot of the female lifeguards, Silverman made frequent, vulgar references to women and sexual matters, commented on the bodies of female lifeguards and beachgoers, and at least twice told female lifeguards that he would like to engage in sex with them. *Id.*, at 1557–1558.

Faragher did not complain to higher management about Terry or Silverman. Although she spoke of their behavior to Gordon, she did not regard these discussions as formal complaints to a supervisor but as conversations with a person she held in high esteem. *Id.*, at 1559. Other female

lifeguards had similarly informal talks with Gordon, but because Gordon did not feel that it was his place to do so, he did not report these complaints to Terry, his own supervisor, or to any other city official. *Id.*, at 1559–1560. Gordon responded to the complaints of one lifeguard by saying that "the City just [doesn't] care." *Id.*, at 1561.

In April 1990, however, two months before Faragher's resignation, Nancy Ewanchew, a former lifeguard, wrote to Richard Bender, the City's Personnel Director, complaining that Terry and Silverman had harassed her and other female lifeguards. *Id.*, at 1559. Following investigation of this complaint, the City found that Terry and Silverman had behaved improperly, reprimanded them, and required them to choose between a suspension without pay or the forfeiture of annual leave. *Ibid.*

On the basis of these findings, the District Court concluded that the conduct of Terry and Silverman was discriminatory harassment sufficiently serious to alter the conditions of Faragher's employment and constitute an abusive working environment. *Id.*, at 1562–1563. The District Court then ruled that there were three justifications for holding the City liable for the harassment of its supervisory employees. First, the court noted that the harassment was pervasive enough to support an inference that the City had "knowledge, or constructive knowledge," of it. *Id.*, at 1563. Next, it ruled that the City was liable under traditional agency principles because Terry and Silverman were acting as its agents when they committed the harassing acts. *Id.*, at 1563–1564. Finally, the court observed that Gordon's knowledge of the harassment, combined with his inaction, "provides a further basis for imputing liability on [sic] the City." *Id.*, at 1564. The District Court then awarded Faragher $1 in nominal damages on her Title VII claim. *Id.*, at 1564–1565.

A panel of the Court of Appeals for the Eleventh Circuit reversed the judgment against the City. 76 F. 3d 1155

(1996).  Although the panel had "no trouble concluding that Terry's and Silverman's conduct . . . was severe and pervasive enough to create an objectively abusive work environment," *id.*, at 1162, it overturned the District Court's conclusion that the City was liable.  The panel ruled that Terry and Silverman were not acting within the scope of their employment when they engaged in the harassment, *id.*, at 1166, that they were not aided in their actions by the agency relationship, *id.*, at 1166, n. 14, and that the City had no constructive knowledge of the harassment by virtue of its pervasiveness or Gordon's actual knowledge, *id.*, at 1167, and n. 16.

In a 7-to-5 decision, the full Court of Appeals, sitting en banc, adopted the panel's conclusion.  111 F. 3d 1530 (1997).  Relying on our decision in *Meritor Savings Bank, FSB* v. *Vinson,* 477 U. S. 57 (1986), and on the Restatement (Second) of Agency § 219 (1957) (hereinafter Restatement), the court held that "an employer may be indirectly liable for hostile environment sexual harassment by a superior: (1) if the harassment occurs within the scope of the superior's employment; (2) if the employer assigns performance of a nondelegable duty to a supervisor and an employee is injured because of the supervisor's failure to carry out that duty; or (3) if there is an agency relationship which aids the supervisor's ability or opportunity to harass his subordinate."  111 F. 3d, at 1534–1535.

Applying these principles, the court rejected Faragher's Title VII claim against the City.  First, invoking standard agency language to classify the harassment by each supervisor as a "frolic" unrelated to his authorized tasks, the court found that in harassing Faragher, Terry and Silverman were acting outside of the scope of their employment and solely to further their own personal ends.  *Id.*, at 1536–1537.  Next, the court determined that the supervisors' agency relationship with the City did not assist them in perpetrating their harassment.  *Id.*, at 1537.  Though noting that "a supervisor is always aided in accomplishing hostile environment sex-

ual harassment by the existence of the agency relationship with his employer because his responsibilities include close proximity to and regular contact with the victim," the court held that traditional agency law does not employ so broad a concept of aid as a predicate of employer liability, but requires something more than a mere combination of agency relationship and improper conduct by the agent. *Ibid.* Because neither Terry nor Silverman threatened to fire or demote Faragher, the court concluded that their agency relationship did not facilitate their harassment. *Ibid.*

The en banc court also affirmed the panel's ruling that the City lacked constructive knowledge of the supervisors' harassment. The court read the District Court's opinion to rest on an erroneous legal conclusion that any harassment pervasive enough to create a hostile environment must *a fortiori* also suffice to charge the employer with constructive knowledge. *Id.,* at 1538. Rejecting this approach, the court reviewed the record and found no adequate factual basis to conclude that the harassment was so pervasive that the City should have known of it, relying on the facts that the harassment occurred intermittently, over a long period of time, and at a remote location. *Ibid.* In footnotes, the court also rejected the arguments that the City should be deemed to have known of the harassment through Gordon, *id.,* at 1538, n. 9, or charged with constructive knowledge because of its failure to disseminate its sexual harassment policy among the lifeguards, *id.,* at 1539, n. 11.

Since our decision in *Meritor,* Courts of Appeals have struggled to derive manageable standards to govern employer liability for hostile environment harassment perpetrated by supervisory employees. While following our admonition to find guidance in the common law of agency, as embodied in the Restatement, the Courts of Appeals have adopted different approaches. Compare, *e. g., Harrison* v. *Eddy Potash, Inc.,* 112 F. 3d 1437 (CA10 1997), vacated, *post,* p. 947; 111 F. 3d 1530 (CA11 1997) (case below); *Gary* v.

*Long,* 59 F. 3d 1391 (CADC), cert. denied, 516 U.S. 1011 (1995); and *Karibian* v. *Columbia University,* 14 F. 3d 773 (CA2), cert. denied, 512 U.S. 1213 (1994). We granted certiorari to address the divergence, 522 U.S. 978 (1997), and now reverse the judgment of the Eleventh Circuit and remand for entry of judgment in Faragher's favor.

## II

### A

Under Title VII of the Civil Rights Act of 1964, "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). We have repeatedly made clear that although the statute mentions specific employment decisions with immediate consequences, the scope of the prohibition " 'is not limited to "economic" or "tangible" discrimination,' " *Harris* v. *Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB* v. *Vinson, supra,* at 64), and that it covers more than " 'terms' and 'conditions' in the narrow contractual sense." *Oncale* v. *Sundowner Offshore Services, Inc.,* 523 U.S. 75, 78 (1998). Thus, in *Meritor* we held that sexual harassment so "severe or pervasive" as to " 'alter the conditions of [the victim's] employment and create an abusive working environment' " violates Title VII. 477 U.S., at 67 (quoting *Henson* v. *Dundee,* 682 F. 2d 897, 904 (CA11 1982)).

In thus holding that environmental claims are covered by the statute, we drew upon earlier cases recognizing liability for discriminatory harassment based on race and national origin, see, *e. g., Rogers* v. *EEOC,* 454 F. 2d 234 (CA5 1971), cert. denied, 406 U.S. 957 (1972); *Firefighters Institute for Racial Equality* v. *St. Louis,* 549 F. 2d 506 (CA8), cert. denied *sub nom. Banta* v. *United States,* 434 U.S. 819 (1977),

just as we have also followed the lead of such cases in attempting to define the severity of the offensive conditions necessary to constitute actionable sex discrimination under the statute. See, *e. g.*, *Rogers, supra*, at 238 ("[M]ere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not sufficiently alter terms and conditions of employment to violate Title VII).[1] See also *Daniels* v. *Essex Group, Inc.*, 937 F. 2d 1264, 1271–1272 (CA7 1991); *Davis* v. *Monsanto Chemical Co.*, 858 F. 2d 345, 349 (CA6 1988), cert. denied, 490 U. S. 1110 (1989); *Snell* v. *Suffolk County*, 782 F. 2d 1094, 1103 (CA2 1986); 1 B. Lindemann & P. Grossman, Employment Discrimination Law 349, and nn. 36–37 (3d ed. 1996) (hereinafter Lindemann & Grossman) (citing cases instructing that "[d]iscourtesy or rudeness should not be confused with racial harassment" and that "a lack of racial sensitivity does not, alone, amount to actionable harassment").

So, in *Harris*, we explained that in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. 510 U. S., at 21–22. We directed courts to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threat-

---

[1] Similarly, Courts of Appeals in sexual harassment cases have properly drawn on standards developed in cases involving racial harassment. See, *e. g.*, *Carrero* v. *New York City Housing Auth.*, 890 F. 2d 569, 577 (CA2 1989) (citing *Lopez* v. *S. B. Thomas, Inc.*, 831 F. 2d 1184, 1189 (CA2 1987), a case of racial harassment, for the proposition that incidents of environmental sexual harassment "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive"). Although racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment.

ening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*, at 23. Most recently, we explained that Title VII does not prohibit "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Oncale*, 523 U. S., at 81. A recurring point in these opinions is that "simple teasing," *id.*, at 82, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment."

These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." *Id.*, at 80. Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992) (hereinafter Lindemann & Kadue) (footnotes omitted). We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view. See, *e. g., Carrero* v. *New York City Housing Auth.*, 890 F. 2d 569, 577–578 (CA2 1989); *Moylan* v. *Maries County*, 792 F. 2d 746, 749–750 (CA8 1986); See also 1 Lindemann & Grossman 805–807, n. 290 (collecting cases granting summary judgment for employers because the alleged harassment was not actionably severe or pervasive).

While indicating the substantive contours of the hostile environments forbidden by Title VII, our cases have established few definite rules for determining when an employer will be liable for a discriminatory environment that is otherwise actionably abusive. Given the circumstances of many of the litigated cases, including some that have come to us, it is not surprising that in many of them, the issue has been joined over the sufficiency of the abusive conditions, not the

standards for determining an employer's liability for them. There have, for example, been myriad cases in which District Courts and Courts of Appeals have held employers liable on account of actual knowledge by the employer, or high-echelon officials of an employer organization, of sufficiently harassing action by subordinates, which the employer or its informed officers have done nothing to stop. See, *e. g., Katz* v. *Dole,* 709 F. 2d 251, 256 (CA4 1983) (upholding employer liability because the "employer's supervisory personnel manifested unmistakable acquiescence in or approval of the harassment"); *EEOC* v. *Hacienda Hotel,* 881 F. 2d 1504, 1516 (CA9 1989) (employer liable where hotel manager did not respond to complaints about supervisors' harassment); *Hall* v. *Gus Constr. Co.,* 842 F. 2d 1010, 1016 (CA8 1988) (holding employer liable for harassment by co-workers because supervisor knew of the harassment but did nothing). In such instances, the combined knowledge and inaction may be seen as demonstrable negligence, or as the employer's adoption of the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy. Cf. *Oncale, supra,* at 77 (victim reported his grounds for fearing rape to company's safety supervisor, who turned him away with no action on complaint).

Nor was it exceptional that standards for binding the employer were not in issue in *Harris, supra.* In that case of discrimination by hostile environment, the individual charged with creating the abusive atmosphere was the president of the corporate employer, 510 U. S., at 19, who was indisputably within that class of an employer organization's officials who may be treated as the organization's proxy. *Burns* v. *McGregor Electronic Industries, Inc.,* 955 F. 2d 559, 564 (CA8 1992) (employer-company liable where harassment was perpetrated by its owner); see *Torres* v. *Pisano,* 116 F. 3d 625, 634–635, and n. 11 (CA2) (noting that a supervisor may hold a sufficiently high position "in the management hierarchy of the company for his actions to be imputed

automatically to the employer"), cert. denied, 522 U. S. 997 (1997); cf. *Katz, supra,* at 255 ("Except in situations where a proprietor, partner or corporate officer participates personally in the harassing behavior," an employee must "demonstrat[e] the propriety of holding the employer liable").

Finally, there is nothing remarkable in the fact that claims against employers for discriminatory employment actions with tangible results, like hiring, firing, promotion, compensation, and work assignment, have resulted in employer liability once the discrimination was shown. See *Meritor,* 477 U. S., at 70–71 (noting that "courts have consistently held employers liable for the discriminatory discharges of employees by supervisory personnel, whether or not the employer knew, should have known, or approved of the supervisor's actions"); *id.,* at 75 (Marshall, J., concurring in judgment) ("[W]hen a supervisor discriminatorily fires or refuses to promote a black employee, that act is, without more, considered the act of the employer"); see also *Anderson* v. *Methodist Evangelical Hospital, Inc.,* 464 F. 2d 723, 725 (CA6 1972) (imposing liability on employer for racially motivated discharge by low-level supervisor, although the "record clearly shows that [its] record in race relations . . . is exemplary").

A variety of reasons have been invoked for this apparently unanimous rule. Some courts explain, in a variation of the "proxy" theory discussed above, that when a supervisor makes such decisions, he "merges" with the employer, and his act becomes that of the employer. See, *e. g., Kotcher* v. *Rosa and Sullivan Appliance Ctr., Inc.,* 957 F. 2d 59, 62 (CA2 1992) ("The supervisor is deemed to act on behalf of the employer when making decisions that affect the economic status of the employee. From the perspective of the employee, the supervisor and the employer merge into a single entity"); *Steele* v. *Offshore Shipbuilding, Inc.,* 867 F. 2d 1311, 1316 (CA11 1989) ("When a supervisor requires sexual favors as a *quid pro quo* for job benefits, the supervisor, by definition, acts as the company"); see also Lindemann &

Grossman 776 (noting that courts hold employers "automatically liable" in *quid pro quo* cases because the "supervisor's actions, in conferring or withholding employment benefits, are deemed as a matter of law to be those of the employer"). Other courts have suggested that vicarious liability is proper because the supervisor acts within the scope of his authority when he makes discriminatory decisions in hiring, firing, promotion, and the like. See, *e. g., Shager* v. *Upjohn Co.*, 913 F. 2d 398, 405 (CA7 1990) ("[A] supervisory employee who fires a subordinate is doing the kind of thing that he is authorized to do, and the wrongful intent with which he does it does not carry his behavior so far beyond the orbit of his responsibilities as to excuse the employer" (citing Restatement § 228)). Others have suggested that vicarious liability is appropriate because the supervisor who discriminates in this manner is aided by the agency relation. See, *e. g., Nichols* v. *Frank*, 42 F. 3d 503, 514 (CA9 1994). Finally, still other courts have endorsed both of the latter two theories. See, *e. g., Harrison*, 112 F. 3d, at 1443; *Henson*, 682 F. 2d, at 910.

The soundness of the results in these cases (and their continuing vitality), in light of basic agency principles, was confirmed by this Court's only discussion to date of standards of employer liability, in *Meritor, supra,* which involved a claim of discrimination by a supervisor's sexual harassment of a subordinate over an extended period. In affirming the Court of Appeals's holding that a hostile atmosphere resulting from sex discrimination is actionable under Title VII, we also anticipated proceedings on remand by holding agency principles relevant in assigning employer liability and by rejecting three *per se* rules of liability or immunity. 477 U. S., at 70–72. We observed that the very definition of employer in Title VII, as including an "agent," *id.*, at 72, expressed Congress's intent that courts look to traditional principles of the law of agency in devising standards of employer liability in those instances where liability for the actions of a super-

visory employee was not otherwise obvious, *ibid.*, and although we cautioned that "common-law principles may not be transferable in all their particulars to Title VII," we cited the Restatement §§ 219–237 with general approval. *Ibid.*

We then proceeded to reject two limitations on employer liability, while establishing the rule that some limitation was intended. We held that neither the existence of a company grievance procedure nor the absence of actual notice of the harassment on the part of upper management would be dispositive of such a claim; while either might be relevant to the liability, neither would result automatically in employer immunity. *Ibid.* Conversely, we held that Title VII placed some limit on employer responsibility for the creation of a discriminatory environment by a supervisor, and we held that Title VII does not make employers "always automatically liable for sexual harassment by their supervisors," *ibid.*, contrary to the view of the Court of Appeals, which had held that "an employer is strictly liable for a hostile environment created by a supervisor's sexual advances, even though the employer neither knew nor reasonably could have known of the alleged misconduct," *id.*, at 69–70.

*Meritor*'s statement of the law is the foundation on which we build today. Neither party before us has urged us to depart from our customary adherence to *stare decisis* in statutory interpretation, *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172–173 (1989) (*stare decisis* has "special force" in statutory interpretation). And the force of precedent here is enhanced by Congress's amendment to the liability provisions of Title VII since the *Meritor* decision, without providing any modification of our holding. Civil Rights Act of 1991, § 102, 105 Stat. 1072, 42 U. S. C. § 1981a; see *Keene Corp.* v. *United States*, 508 U. S. 200, 212 (1993) (applying the "presumption that Congress was aware of [prior] judicial interpretations and, in effect, adopted them"). See also *infra*, at 804, n. 4.

## B

The Court of Appeals identified, and rejected, three possible grounds drawn from agency law for holding the City vicariously liable for the hostile environment created by the supervisors. It considered whether the two supervisors were acting within the scope of their employment when they engaged in the harassing conduct. The court then enquired whether they were significantly aided by the agency relationship in committing the harassment, and also considered the possibility of imputing Gordon's knowledge of the harassment to the City. Finally, the Court of Appeals ruled out liability for negligence in failing to prevent the harassment. Faragher relies principally on the latter three theories of liability.

## 1

A "master is subject to liability for the torts of his servants committed while acting in the scope of their employment." Restatement § 219(1). This doctrine has traditionally defined the "scope of employment" as including conduct "of the kind [a servant] is employed to perform," occurring "substantially within the authorized time and space limits," and "actuated, at least in part, by a purpose to serve the master," but as excluding an intentional use of force "unexpectable by the master." *Id.*, § 228(1).

Courts of Appeals have typically held, or assumed, that conduct similar to the subject of this complaint falls outside the scope of employment. See, *e. g., Harrison*, 112 F. 3d, at 1444 (sexual harassment "'simply is not within the job description of any supervisor or any other worker in any reputable business'"); 111 F. 3d, at 1535–1536 (case below); *Andrade* v. *Mayfair Management, Inc.*, 88 F. 3d 258, 261 (CA4 1996) ("[I]llegal sexual harassment is . . . beyond the scope of supervisors' employment"); *Gary*, 59 F. 3d, at 1397 (harassing supervisor acts outside the scope of his employ-

ment in creating hostile environment); *Nichols* v. *Frank*, 42 F. 3d 503, 508 (CA9 1994) ("The proper analysis for employer liability in hostile environment cases is . . . *not* whether an employee was acting within his 'scope of employment'"); *Bouton* v. *BMW of North Am., Inc.*, 29 F. 3d 103, 107 (CA3 1994) (sexual harassment is outside scope of employment); see also *Ellerth* v. *Burlington Industries, Inc.*, decided with *Jansen* v. *Packaging Corp. of America*, 123 F. 3d 490, 561 (CA7 1997) (en banc) (Manion, J., concurring and dissenting) (supervisor's harassment would fall within scope of employment only in "the rare case indeed"), aff'd, *ante*, p. 742; Lindemann & Grossman 812 ("Hostile environment sexual harassment normally does not trigger respondeat superior liability because sexual harassment rarely, if ever, is among the official duties of a supervisor"). But cf. *Martin* v. *Cavalier Hotel Corp.*, 48 F. 3d 1343, 1351–1352 (CA4 1995) (holding employer vicariously liable in part based on finding that the supervisor's rape of employee was within the scope of employment); *Kauffman* v. *Allied Signal, Inc.*, 970 F. 2d 178, 184 (CA6) (holding that a supervisor's harassment was within the scope of his employment, but nevertheless requiring the victim to show that the employer failed to respond adequately when it learned of the harassment), cert. denied, 506 U. S. 1041 (1992). In so doing, the courts have emphasized that harassment consisting of unwelcome remarks and touching is motivated solely by individual desires and serves no purpose of the employer. For this reason, courts have likened hostile environment sexual harassment to the classic "frolic and detour" for which an employer has no vicarious liability.

These cases ostensibly stand in some tension with others arising outside Title VII, where the scope of employment has been defined broadly enough to hold employers vicariously liable for intentional torts that were in no sense inspired by any purpose to serve the employer. In *Ira S. Bushey & Sons, Inc.* v. *United States*, 398 F. 2d 167 (1968), for example,

the Second Circuit charged the Government with vicarious liability for the depredation of a drunken sailor returning to his ship after a night's carouse, who inexplicably opened valves that flooded a drydock, damaging both the drydock and the ship.  Judge Friendly acknowledged that the sailor's conduct was not remotely motivated by a purpose to serve his employer, but relied on the "deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities," and imposed vicarious liability on the ground that the sailor's conduct "was not so 'unforeseeable' as to make it unfair to charge the Government with responsibility."  *Id.*, at 171.  Other examples of an expansive sense of scope of employment are readily found, see, *e. g., Leonbruno* v. *Champlain Silk Mills,* 229 N. Y. 470, 128 N. E. 711 (1920) (opinion of Cardozo, J.) (employer was liable under worker's compensation statute for eye injury sustained when employee threw an apple at another; the accident arose "in the course of employment" because such horseplay should be expected); *Carr* v. *Wm. C. Crowell Co.,* 28 Cal. 2d 652, 171 P. 2d 5 (1946) (employer liable for actions of carpenter who attacked a co-employee with a hammer).  Courts, in fact, have treated scope of employment generously enough to include sexual assaults.  See, *e. g., Primeaux* v. *United States,* 102 F. 3d 1458, 1462–1463 (CA8 1996) (federal police officer on limited duty sexually assaulted stranded motorist); *Mary M.* v. *Los Angeles,* 54 Cal. 3d 202, 216–221, 814 P. 2d 1341, 1349–1352 (1991) (en banc) (police officer raped motorist after placing her under arrest); *Doe* v. *Samaritan Counseling Ctr.,* 791 P. 2d 344, 348–349 (Alaska 1990) (therapist had sexual relations with patient); *Turner* v. *State,* 494 So. 2d 1291, 1296 (La. App. 1986) (National Guard recruiting officer committed sexual battery during sham physical examinations); *Lyon* v. *Carey,* 533 F. 2d 649, 655 (CADC 1976) (furniture delivery-man raped recipient of furniture); *Samuels* v. *Southern Baptist Hospital,* 594 So. 2d 571, 574 (La. App. 1992) (nursing

assistant raped patient).[2]   The rationales for these decisions
have varied, with some courts echoing *Bushey* in explaining
that the employee's acts were foreseeable and that the em-
ployer should in fairness bear the resulting costs of doing
business, see, *e. g., Mary M., supra,* at 218, 814 P. 2d, at 1350,
and others finding that the employee's sexual misconduct
arose from or was in some way related to the employee's
essential duties.   See, *e. g., Samuels, supra,* at 574 (tortious
conduct was "reasonably incidental" to the performance of
the nursing assistant's duties in caring for a "helpless" pa-
tient in a "locked environment").

An assignment to reconcile the run of the Title VII cases
with those just cited would be a taxing one.   Here it is
enough to recognize that their disparate results do not neces-
sarily reflect wildly varying terms of the particular employ-
ment contracts involved, but represent differing judgments
about the desirability of holding an employer liable for his
subordinates' wayward behavior.   In the instances in which
there is a genuine question about the employer's responsibil-
ity for harmful conduct he did not in fact authorize, a holding
that the conduct falls within the scope of employment ul-
timately expresses a conclusion not of fact but of law.   As
one eminent authority has observed, the "highly indefinite
phrase" is "devoid of meaning in itself" and is "obviously
no more than a bare formula to cover the unordered and
unauthorized acts of the servant for which it is found to be
expedient to charge the master with liability, as well as to
exclude other acts for which it is not."   W. Keeton, D.
Dobbs, R. Keeton, & D. Owen, *Prosser and Keaton on Law
of Torts* 502 (5th ed. 1984); see also Seavey, Speculations as
to "Respondeat Superior," in *Studies in Agency* 129, 155

---

[2] It bears noting that many courts in non-Title VII cases have held sex-
ual assaults to fall outside the scope of employment.   See Note, "Scope of
Employment" Redefined: Holding Employers Vicariously Liable for Sexual
Assaults Committed by their Employees, 76 Minn. L. Rev. 1513, 1521–1522,
and nn. 33, 34 (1992) (collecting cases).

(1949) ("The liability of a master to a third person for the torts of a servant has been widely extended by aid of the elastic phrase 'scope of the employment' which may be used to include all which the court wishes to put into it"). Older cases, for example, treated smoking by an employee during working hours as an act outside the scope of employment, but more recently courts have generally held smoking on the job to fall within the scope. Prosser & Keeton, *supra*, at 504, and n. 23. It is not that employers formerly did not authorize smoking but have now begun to do so, or that employees previously smoked for their own purposes but now do so to serve the employer. We simply understand smoking differently now and have revised the old judgments about what ought to be done about it.

The proper analysis here, then, calls not for a mechanical application of indefinite and malleable factors set forth in the Restatement, see, *e. g.*, §§ 219, 228, 229, but rather an enquiry into the reasons that would support a conclusion that harassing behavior ought to be held within the scope of a supervisor's employment, and the reasons for the opposite view. The Restatement itself points to such an approach, as in the commentary that the "ultimate question" in determining the scope of employment is "whether or not it is just that the loss resulting from the servant's acts should be considered as one of the normal risks to be borne by the business in which the servant is employed." *Id.*, § 229, Comment *a*. See generally *Taber* v. *Maine*, 67 F. 3d 1029, 1037 (CA2 1995) ("As the leading Torts treatise has put it, 'the integrating principle' of *respondeat superior* is 'that the employer should be liable for those faults that may be fairly regarded as risks of his business, whether they are committed in furthering it or not'" (quoting 5 F. Harper, F. James, & O. Gray, Law of Torts § 26.8, pp. 40–41 (2d ed. 1986))).

In the case before us, a justification for holding the offensive behavior within the scope of Terry's and Silverman's employment was well put in Judge Barkett's dissent: "[A]

pervasively hostile work environment of sexual harassment is never (one would hope) authorized, but the supervisor is clearly charged with maintaining a productive, safe work environment. The supervisor directs and controls the conduct of the employees, and the manner of doing so may inure to the employer's benefit or detriment, including subjecting the employer to Title VII liability." 111 F. 3d, at 1542 (opinion dissenting in part and concurring in part). It is by now well recognized that hostile environment sexual harassment by supervisors (and, for that matter, coemployees) is a persistent problem in the workplace. See Lindemann & Kadue 4–5 (discussing studies showing prevalence of sexual harassment); *Ellerth*, 123 F. 3d, at 511 (Posner, C. J., concurring and dissenting) ("[E]veryone knows by now that sexual harassment is a common problem in the American workplace"). An employer can, in a general sense, reasonably anticipate the possibility of such conduct occurring in its workplace, and one might justify the assignment of the burden of the untoward behavior to the employer as one of the costs of doing business, to be charged to the enterprise rather than the victim. As noted, *supra*, at 796–797, developments like this occur from time to time in the law of agency.

Two things counsel us to draw the contrary conclusion. First, there is no reason to suppose that Congress wished courts to ignore the traditional distinction between acts falling within the scope and acts amounting to what the older law called frolics or detours from the course of employment. Such a distinction can readily be applied to the spectrum of possible harassing conduct by supervisors, as the following examples show. First, a supervisor might discriminate racially in job assignments in order to placate the prejudice pervasive in the labor force. Instances of this variety of the heckler's veto would be consciously intended to further the employer's interests by preserving peace in the workplace. Next, supervisors might reprimand male employees for workplace failings with banter, but respond to women's

shortcomings in harsh or vulgar terms. A third example might be the supervisor who, as here, expresses his sexual interests in ways having no apparent object whatever of serving an interest of the employer. If a line is to be drawn between scope and frolic, it would lie between the first two examples and the third, and it thus makes sense in terms of traditional agency law to analyze the scope issue, in cases like the third example, just as most federal courts addressing that issue have done, classifying the harassment as beyond the scope of employment.

The second reason goes to an even broader unanimity of views among the holdings of District Courts and Courts of Appeals thus far. Those courts have held not only that the sort of harassment at issue here was outside the scope of supervisors' authority, but, by uniformly judging employer liability for co-worker harassment under a negligence standard, they have also implicitly treated such harassment as outside the scope of common employees' duties as well. See *Blankenship* v. *Parke Care Centers, Inc.*, 123 F. 3d 868, 872–873 (CA6 1997), cert. denied, 522 U. S. 1110 (1998); *Fleming* v. *Boeing Co.*, 120 F. 3d 242, 246 (CA11 1997); *Perry* v. *Ethan Allen, Inc.*, 115 F. 3d 143, 149 (CA2 1997); *Yamaguchi* v. *United States Dept. of Air Force*, 109 F. 3d 1475, 1483 (CA9 1997); *Varner* v. *National Super Markets, Inc.*, 94 F. 3d 1209, 1213 (CA8 1996), cert. denied, 519 U. S. 1110 (1997); *McKenzie* v. *Illinois Dept. of Transp.*, 92 F. 3d 473, 480 (CA7 1996); *Andrade*, 88 F. 3d, at 261; *Waymire* v. *Harris County*, 86 F. 3d 424, 428–429 (CA5 1996); *Hirase-Doi* v. *U. S. West Communications, Inc.*, 61 F. 3d 777, 783 (CA10 1995); *Andrews* v. *Philadelphia*, 895 F. 2d 1469, 1486 (CA3 1990); cf. *Morrison* v. *Carleton Woolen Mills, Inc.*, 108 F. 3d 429, 438 (CA1 1997) (applying "knew or should have known" standard to claims of environmental harassment by a supervisor); see also 29 CFR § 1604.11(d) (1997) (employer is liable for co-worker harassment if it "knows or should have known of the conduct, unless it can show that it took immediate and ap-

propriate corrective action"); 3 L. Larson & A. Larson, Employment Discrimination § 46.07[4][a], p. 46–101 (2d ed. 1998) (courts "uniformly" apply Equal Employment Opportunity Commission (EEOC) rule; "[i]t is not a controversial area"). If, indeed, the cases did not rest, at least implicitly, on the notion that such harassment falls outside the scope of employment, their liability issues would have turned simply on the application of the scope-of-employment rule. Cf. *Hunter* v. *Allis-Chalmers, Inc.*, 797 F. 2d 1417, 1422 (CA7 1986) (noting that employer will not usually be liable under *respondeat superior* for employee's racial harassment because it "would be the rare case where racial harassment . . . could be thought by the author of the harassment to help the employer's business").

It is quite unlikely that these cases would escape efforts to render them obsolete if we were to hold that supervisors who engage in discriminatory harassment are necessarily acting within the scope of their employment. The rationale for placing harassment within the scope of supervisory authority would be the fairness of requiring the employer to bear the burden of foreseeable social behavior, and the same rationale would apply when the behavior was that of co-employees. The employer generally benefits just as obviously from the work of common employees as from the work of supervisors; they simply have different jobs to do, all aimed at the success of the enterprise. As between an innocent employer and an innocent employee, if we use scope-of-employment reasoning to require the employer to bear the cost of an actionably hostile workplace created by one class of employees (*i. e.*, supervisors), it could appear just as appropriate to do the same when the environment was created by another class (*i. e.*, co-workers).

The answer to this argument might well be to point out that the scope of supervisory employment may be treated separately by recognizing that supervisors have special authority enhancing their capacity to harass, and that the

employer can guard against their misbehavior more easily because their numbers are by definition fewer than the numbers of regular employees.   But this answer happens to implicate an entirely separate category of agency law (to be considered in the next section), which imposes vicarious liability on employers for tortious acts committed by use of particular authority conferred as an element of an employee's agency relationship with the employer.   Since the virtue of categorical clarity is obvious, it is better to reject reliance on misuse of supervisory authority (without more) as irrelevant to scope-of-employment analysis.

2

The Court of Appeals also rejected vicarious liability on the part of the City insofar as it might rest on the concluding principle set forth in § 219(2)(d) of the Restatement, that an employer "is not subject to liability for the torts of his servants acting outside the scope of their employment unless . . . the servant purported to act or speak on behalf of the principal and there was reliance on apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation."   Faragher points to several ways in which the agency relationship aided Terry and Silverman in carrying out their harassment.   She argues that in general offending supervisors can abuse their authority to keep subordinates in their presence while they make offensive statements, and that they implicitly threaten to misuse their supervisory powers to deter any resistance or complaint.   Thus, she maintains that power conferred on Terry and Silverman by the City enabled them to act for so long without provoking defiance or complaint.

The City, however, contends that § 219(2)(d) has no application here.   It argues that the second qualification of the subsection, referring to a servant "aided in accomplishing the tort by the existence of the agency relation," merely "refines" the one preceding it, which holds the employer vicari-

ously liable for its servant's abuse of apparent authority. Brief for Respondent 30–31, and n. 24. But this narrow reading is untenable; it would render the second qualification of § 219(2)(d) almost entirely superfluous (and would seem to ask us to shut our eyes to the potential effects of supervisory authority, even when not explicitly invoked). The illustrations accompanying this subsection make clear that it covers not only cases involving the abuse of apparent authority, but also cases in which tortious conduct is made possible or facilitated by the existence of the actual agency relationship. See Restatement § 219, Comment *e* (noting employer liability where "the servant may be able to cause harm because of his position as agent, as where a telegraph operator sends false messages purporting to come from third persons" and where the manager who operates a store "for an undisclosed principal is enabled to cheat the customers because of his position"); *id.*, § 247, Illustration 1 (noting a newspaper's liability for a libelous editorial published by an editor acting for his own purposes).

We therefore agree with Faragher that in implementing Title VII it makes sense to hold an employer vicariously liable for some tortious conduct of a supervisor made possible by abuse of his supervisory authority, and that the aided-by-agency-relation principle embodied in § 219(2)(d) of the Restatement provides an appropriate starting point for determining liability for the kind of harassment presented here.[3] Several courts, indeed, have noted what Faragher has argued, that there is a sense in which a harassing supervisor is always assisted in his misconduct by the supervisory relationship. See, *e. g., Rodgers* v. *Western-Southern Life Ins.*

---

[3] We say "starting point" because our obligation here is not to make a pronouncement of agency law in general or to transplant § 219(2)(d) into Title VII. Rather, it is to adapt agency concepts to the practical objectives of Title VII. As we said in *Meritor Savings Bank, FSB* v. *Vinson,* 477 U. S. 57, 72 (1986), "common-law principles may not be transferable in all their particulars to Title VII."

*Co.,* 12 F. 3d 668, 675 (CA7 1993); *Taylor* v. *Metzger,* 152 N. J. 490, 505, 706 A. 2d 685, 692 (1998) (emphasizing that a supervisor's conduct may have a greater impact than that of colleagues at the same level); cf. *Torres,* 116 F. 3d, at 631. See also *White* v. *Monsanto Co.,* 585 So. 2d 1205, 1209–1210 (La. 1991) (a supervisor's harassment of a subordinate is more apt to rise to the level of intentional infliction of emotional distress than comparable harassment by a coemployee); *Contreras* v. *Crown Zellerbach Corp.,* 88 Wash. 2d 735, 740, 565 P. 2d 1173, 1176 (1977) (same); *Alcorn* v. *Anbro Engineering, Inc.,* 2 Cal. 3d 493, 498–499, and n. 2, 468 P. 2d 216, 218–219, and n. 2 (1970) (same). The agency relationship affords contact with an employee subjected to a supervisor's sexual harassment, and the victim may well be reluctant to accept the risks of blowing the whistle on a superior. When a person with supervisory authority discriminates in the terms and conditions of subordinates' employment, his actions necessarily draw upon his superior position over the people who report to him, or those under them, whereas an employee generally cannot check a supervisor's abusive conduct the same way that she might deal with abuse from a co-worker. When a fellow employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor, whose "power to supervise—[which may be] to hire and fire, and to set work schedules and pay rates—does not disappear . . . when he chooses to harass through insults and offensive gestures rather than directly with threats of firing or promises of promotion." Estrich, Sex at Work, 43 Stan. L. Rev. 813, 854 (1991). Recognition of employer liability when discriminatory misuse of supervisory authority alters the terms and conditions of a victim's employment is underscored by the fact that the employer has a greater opportunity to guard against misconduct by supervisors than by common workers; employers have greater opportunity and incentive to screen them, train them, and monitor their performance.

In sum, there are good reasons for vicarious liability for misuse of supervisory authority. That rationale must, however, satisfy one more condition. We are not entitled to recognize this theory under Title VII unless we can square it with *Meritor*'s holding that an employer is not "automatically" liable for harassment by a supervisor who creates the requisite degree of discrimination,[4] and there is obviously some tension between that holding and the position that a supervisor's misconduct aided by supervisory authority subjects the employer to liability vicariously; if the "aid" may be the unspoken suggestion of retaliation by misuse of supervisory authority, the risk of automatic liability is high. To counter it, we think there are two basic alternatives, one being to require proof of some affirmative invocation of that authority by the harassing supervisor, the other to recognize an affirmative defense to liability in some circumstances, even when a supervisor has created the actionable environment.

There is certainly some authority for requiring active or affirmative, as distinct from passive or implicit, misuse of supervisory authority before liability may be imputed. That is the way some courts have viewed the familiar cases holding the employer liable for discriminatory employment

[4] We are bound to honor *Meritor* on this point not merely because of the high value placed on *stare decisis* in statutory interpretation, *supra*, at 792, but for a further reason as well. With the amendments enacted by the Civil Rights Act of 1991, Congress both expanded the monetary relief available under Title VII to include compensatory and punitive damages, see §102, 105 Stat. 1072, 42 U. S. C. §1981a, and modified the statutory grounds of several of our decisions, see §101 *et seq.* The decision of Congress to leave *Meritor* intact is conspicuous. We thus have to assume that in expanding employers' potential liability under Title VII, Congress relied on our statements in *Meritor* about the limits of employer liability. To disregard those statements now (even if we were convinced of reasons for doing so) would be not only to disregard *stare decisis* in statutory interpretation, but to substitute our revised judgment about the proper allocation of the costs of harassment for Congress's considered decision on the subject.

action with tangible consequences, like firing and demotion. See *supra*, at 790. And we have already noted some examples of liability provided by the Restatement itself, which suggest that an affirmative misuse of power might be required. See *supra*, at 802 (telegraph operator sends false messages, a store manager cheats customers, editor publishes libelous editorial).

But neat examples illustrating the line between the affirmative and merely implicit uses of power are not easy to come by in considering management behavior. Supervisors do not make speeches threatening sanctions whenever they make requests in the legitimate exercise of managerial authority, and yet every subordinate employee knows the sanctions exist; this is the reason that courts have consistently held that acts of supervisors have greater power to alter the environment than acts of coemployees generally, see *supra*, at 802–803. How far from the course of ostensible supervisory behavior would a company officer have to step before his orders would not reasonably be seen as actively using authority? Judgment calls would often be close, the results would often seem disparate even if not demonstrably contradictory, and the temptation to litigate would be hard to resist. We think plaintiffs and defendants alike would be poorly served by an active-use rule.

The other basic alternative to automatic liability would avoid this particular temptation to litigate, but allow an employer to show as an affirmative defense to liability that the employer had exercised reasonable care to avoid harassment and to eliminate it when it might occur, and that the complaining employee had failed to act with like reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided. This composite defense would, we think, implement the statute sensibly, for reasons that are not hard to fathom.

Although Title VII seeks "to make persons whole for injuries suffered on account of unlawful employment discrim-

ination," *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 418 (1975), its "primary objective," like that of any statute meant to influence primary conduct, is not to provide redress but to avoid harm. *Id.,* at 417. As long ago as 1980, the EEOC, charged with the enforcement of Title VII, 42 U. S. C. § 2000e–4, adopted regulations advising employers to "take all steps necessary to prevent sexual harassment from occurring, such as . . . informing employees of their right to raise and how to raise the issue of harassment." 29 CFR § 1604.11(f) (1997), and in 1990 the EEOC issued a policy statement enjoining employers to establish a complaint procedure "designed to encourage victims of harassment to come forward [without requiring] a victim to complain first to the offending supervisor." EEOC Policy Guidance on Sexual Harassment, 8 FEP Manual 405:6699 (Mar. 19, 1990) (internal quotation marks omitted). It would therefore implement clear statutory policy and complement the Government's Title VII enforcement efforts to recognize the employer's affirmative obligation to prevent violations and give credit here to employers who make reasonable efforts to discharge their duty. Indeed, a theory of vicarious liability for misuse of supervisory power would be at odds with the statutory policy if it failed to provide employers with some such incentive.

The requirement to show that the employee has failed in a coordinate duty to avoid or mitigate harm reflects an equally obvious policy imported from the general theory of damages, that a victim has a duty "to use such means as are reasonable under the circumstances to avoid or minimize the damages" that result from violations of the statute. *Ford Motor Co.* v. *EEOC,* 458 U. S. 219, 231, n. 15 (1982) (quoting C. McCormick, Law of Damages 127 (1935) (internal quotation marks omitted). An employer may, for example, have provided a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense. If the plaintiff unreasonably

failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so. If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided.

In order to accommodate the principle of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees, we adopt the following holding in this case and in *Burlington Industries, Inc.* v. *Ellerth, ante*, p. 742, also decided today. An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a

demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. See *Burlington, ante,* at 762–763.

Applying these rules here, we believe that the judgment of the Court of Appeals must be reversed. The District Court found that the degree of hostility in the work environment rose to the actionable level and was attributable to Silverman and Terry. It is undisputed that these supervisors "were granted virtually unchecked authority" over their subordinates, "directly controll[ing] and supervis[ing] all aspects of [Faragher's] day-to-day activities." 111 F. 3d, at 1544 (Barkett, J., dissenting in part and concurring in part). It is also clear that Faragher and her colleagues were "completely isolated from the City's higher management." *Ibid.* The City did not seek review of these findings.

While the City would have an opportunity to raise an affirmative defense if there were any serious prospect of its presenting one, it appears from the record that any such avenue is closed. The District Court found that the City had entirely failed to disseminate its policy against sexual harassment among the beach employees and that its officials made no attempt to keep track of the conduct of supervisors like Terry and Silverman. The record also makes clear that the City's policy did not include any assurance that the harassing supervisors could be bypassed in registering complaints. App. 274. Under such circumstances, we hold as a matter of law that the City could not be found to have exercised reasonable care to prevent the supervisors' harassing conduct. Unlike the employer of a small work force, who might expect that sufficient care to prevent tortious behavior could be exercised informally, those responsible for city operations could not reasonably have thought that precautions against hostile environments in any one of many departments in far-

flung locations could be effective without communicating some formal policy against harassment, with a sensible complaint procedure.

We have drawn this conclusion without overlooking two possible grounds upon which the City might argue for the opportunity to litigate further. There is, first, the Court of Appeals's indulgent gloss on the relevant evidence: "There is some evidence that the City did not effectively disseminate among Marine Safety employees its sexual harassment policy." 111 F. 3d, at 1539, n. 11. But, in contrast to the Court of Appeals's characterization, the District Court made an explicit finding of a "complete failure on the part of the City to disseminate said policy among Marine Safety Section employees." 864 F. Supp., at 1560. The evidence supports the District Court's finding and there is no contrary claim before us.

The second possible ground for pursuing a defense was asserted by the City in its argument addressing the possibility of negligence liability in this case. It said that it should not be held liable for failing to promulgate an antiharassment policy, because there was no apparent duty to do so in the 1985–1990 period. The City purports to rest this argument on the position of the EEOC during the period mentioned, but it turns out that the record on this point is quite against the City's position. Although the EEOC issued regulations dealing with promulgating a statement of policy and providing a complaint mechanism in 1990, see *supra*, at 806, ever since 1980 its regulations have called for steps to prevent violations, such as informing employees of their rights and the means to assert them, *ibid.* The City, after all, adopted an antiharassment policy in 1986.

The City points to nothing that might justify a conclusion by the District Court on remand that the City had exercised reasonable care. Nor is there any reason to remand for consideration of Faragher's efforts to mitigate her own damages, since the award to her was solely nominal.

3

The Court of Appeals also rejected the possibility that it could hold the City liable for the reason that it knew of the harassment vicariously through the knowledge of its supervisors. We have no occasion to consider whether this was error, however. We are satisfied that liability on the ground of vicarious knowledge could not be determined without further factfinding on remand, whereas the reversal necessary on the theory of supervisory harassment renders any remand for consideration of imputed knowledge entirely unjustifiable (as would be any consideration of negligence as an alternative to a theory of vicarious liability here).

## III

The judgment of the Court of Appeals for the Eleventh Circuit is reversed, and the case is remanded for reinstatement of the judgment of the District Court.

*It is so ordered.*

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, dissenting.

For the reasons given in my dissenting opinion in *Burlington Industries, Inc.* v. *Ellerth, ante,* p. 742, absent an adverse employment consequence, an employer cannot be held vicariously liable if a supervisor creates a hostile work environment. Petitioner suffered no adverse employment consequence; thus the Court of Appeals was correct to hold that the city of Boca Raton (City) is not vicariously liable for the conduct of Chief Terry and Lieutenant Silverman. Because the Court reverses this judgment, I dissent.

As for petitioner's negligence claim, the District Court made no finding as to the City's negligence, and the Court of Appeals did not directly consider the issue. I would therefore remand the case to the District Court for further proceedings on this question alone. I disagree with the Court's

conclusion that merely because the City did not disseminate its sexual harassment policy, it should be liable as a matter of law. See *ante*, at 808–809.[1] The City should be allowed to show either that: (1) there was a reasonably available avenue through which petitioner could have complained to a City official who supervised both Chief Terry and Lieutenant Silverman, see Brief for United States and EEOC as *Amici Curiae* in *Meritor Savings Bank, FSB* v. *Vinson*, O. T. 1985, No. 84–1979, p. 26,[2] or (2) it would not have learned of the harassment even if the policy had been distributed.[3] Petitioner, as the plaintiff, would of course bear the burden of proving the City's negligence.

---

[1] The harassment alleged in this case occurred intermittently over a 5-year period between 1985 and 1990; the District Court's factual findings do not indicate when in 1990 it ceased. It was only in March 1990 that the Equal Employment Opportunity Commission (EEOC) issued a "policy statement" "enjoining" employers to establish complaint procedures for sexual harassment. See *ante*, at 806. The 1980 Guideline on which the Court relies—because the EEOC has no substantive rulemaking authority under Title VII, the Court is inaccurate to refer to it as a "regulatio[n]," see *ante*, at 809—was wholly precatory and as such cannot establish negligence *per se.* See 29 CFR § 1604.11(f) (1997) ("An employer should take all steps necessary to prevent sexual harassment from occurring . . . ").

[2] The City's Employment Handbook stated that employees with "complaints or grievances" could speak to the City's Personnel and Labor Relations Director about problems at work. See App. 280. The District Court found that the City's Personnel Director, Richard Bender, moved quickly to investigate the harassment charges against Terry and Silverman once they were brought to his attention. See App. to Pet. for Cert. 80a.

[3] Even after petitioner read the City's sexual harassment policy in 1990, see App. 188, she did not file a charge with City officials. Instead, she filed suit against the City in 1992.