Rita LAMB, Plaintiff,

v.

CITY OF WEST UNIVERSITY PLACE, Defendant.

No. H–99–1763.

United States District Court, S.D. Texas, Houston Division.

Dec. 21, 2000.

Sheila R. Haley, Cordell & Haley, Houston, TX, for Rita A Lamb, plaintiff.

Susan Louise Bickley, Abrams Scott and Bickley, Houston, TX, for City of West University Place Police Department, defendant.

### MEMORANDUM AND ORDER

ATLAS, District Judge.

Plaintiff, Rita Lamb, alleges that she suffered sexual harassment and retaliation at the hands of her supervisor, Sergeant Michael Peterson, and her employer, the Police Department for the City of West University Place. Defendant, the City of West University Place, has moved for summary judgment. *See* Defendant's Motion to Dismiss, or Alternatively, for Summary Judgment [Doc. # 49] ("Defendant's Motion"); Summary Judgment Record of West University Place [Doc. # 50] ("Defendant's Record"). Plaintiff Lamb has filed her response. *See* Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment [Doc. # 51] ("Plaintiff's Response"). Having considered the parties' briefs, replies, all matters of record and the applicable authorities, the Court concludes that Defendant's Motion should be **granted.**

### I. BACKGROUND FACTS

Beginning in August 1994, Rita Lamb ("Lamb") was employed by the Police Department for the City of West University Place ("Department") as a records clerk. Lamb alleges that in the months following her hire, police officer Michael Peterson ("Peterson") began to linger in her office, asking personal questions and suggesting that he and Lamb "get together" after work. *See* Affidavit of Rita A. Lamb (Exh. A to Plaintiff's Response) ("Lamb Affidavit"), ¶ 3. Lamb claims that she ignored Peterson's advances and rebuffed his invitations. *Id.*, ¶ 4. In January 1995, Peterson was promoted to administrative

services sergeant, and he became Lamb's direct supervisor. Lamb alleges that Peterson continued to act in a "sexually suggestive" way towards her, using body language and a tone of voice that she believed indicated more than "friendly office banter." *Id.*

In February 1995, Lamb received a six-months performance review from Peterson. *See* Performance Review Report, February 23, 1995 (Exh. E to Plaintiff's Response). The review was generally positive, noting only that Lamb needed to improve certain computer skills and "communicate needs for time off with Supervisor." In March 1995, Lamb received a "letter of counseling." *See* Letter from Sergeant Mike Peterson to Rita Lamb, March 13, 1995 (Exh. F to Plaintiff's Response). The letter informed Lamb that she needed to improve her attendance, tardiness and work habits. The letter also states that "[there] is a perception that you take things personally and get defensive when criticized." In August 1995, Lamb received her one-year performance review from Peterson. *See* Performance Review Report, August 23, 1995 (Exh. G to Plaintiff's Exhibit). The review compliments Lamb's organizational skills and the quality of her work. The review notes, however, that Lamb has problems with tardiness and that she "[needs] to spend more time working at [her] desk" rather than socializing with other employees. The review also rebukes Lamb for discussing work-related problems with other employees and suggests that she "keep personal problems to [her]self." The score Lamb received on her August 1995 review prevented her from receiving a merit-based pay increase. *See* Affidavit of Stephen M. Griffith (Exh. C to Defendant's Record), ¶ 6.

In January 1996, Lamb informed Acting Chief of Police Gary Brye that she be-

lieved Peterson was engaging in sexually harassing behavior, and that she believed he had retaliated against her (for rejecting his advances) by giving her a negative performance review. Lamb Aff., ¶ 10. Specifically, Lamb related an incident which had occurred during the summer of 1995 when her sister had come to visit her at work. Peterson had asked Lamb what Lamb's sister thought of him; Lamb answered that her sister thought Peterson had big hands. Peterson responded, "that's not all." *See* Employee Performance Information, March 19, 1996, Exhibit 7 to Affidavit of Linda Moore (Exh. A to Defendant's Record) ("Moore Affidavit"). Brye immediately "realigned the chain of command" so that he, and not Peterson, would act as Lamb's supervisor. *See* Deposition of Gary Brye (Exh. C to Plaintiff's Response), at 68; Affidavit of Michael Peterson (Exh. F to Defendant's Record), ¶ 3. Brye also investigated the incident, and, in March 1996, noted the incident in Peterson's personnel file and counseled Peterson for approximately half an hour, telling Peterson that his comments were inappropriate and that they were to cease immediately. *Id.* at 28–29.

On June 4, 1996, Lamb found a piece of paper on the floor behind her chair. The paper contained the message, "Eat *me* you worthless worm! The Big *Kahuna* your Daddy." *See* Exh. I to Plaintiff's Response. Lamb recognized the writing as Peterson's, and she called her coworkers to look at the note. When confronted, Peterson admitted that the note was his. However, he stated that he had sent the fax as a joke to police dispatcher Marc Bumbera, and he claimed that the note had fallen from the fax machine, landing near Lamb's desk. Peterson Aff., ¶ 6. The Department responded promptly. The incident was documented in writing and noted in Peterson's personnel file. *See* Employee Performance Information, June 4, 1996, Exhibit 2 to Affidavit of Gary Brye (Exh.

E. to Defendant's Record) ("Brye Affidavit"). Brye assigned a fact finding committee to investigate the incident. Brye Aff., ¶ 5(c). Police Chief Stephen Griffith disciplined Peterson by suspending him for a day without pay. Griffith Aff., ¶ 6. In addition, Peterson gave Lamb a written apology as well as apologizing face-to-face. *Id.*

On July 11, 1996, Lamb sent a grievance to West University Place City Manager Robert Yehl ("Yehl"). *See* Letter from Rita Lamb to Robert P. Yehl, City Manager, July 11, 1996 (Exh. P to Plaintiff's Response). In her grievance, Lamb claimed that she had been sexually harassed by Sergeant Peterson, and that because he had not been adequately disciplined, his "offensive behavior . . . continues to this day [and has] actually escalated in severity." Lamb also claimed that she had suffered retaliation from the Department when she failed to receive a pay raise, and that her job duties had been reduced and her attendance/tardiness record subjected to greater scrutiny than that of other employees. In response to Lamb's grievance, Yehl assigned a police detective to investigate Lamb's allegations. *See* Affidavit of Robert (Sherman) Yehl (Exh. B to Defendant's Response) ("Yehl Affidavit"), ¶ 5(a). When Lamb's attorney objected to the City's "investigating itself," Yehl agreed to appoint an outside investigator. *Id.*, ¶ 5(c). Lamb's attorney also expressed concern that the Department would destroy records documenting past complaints about Peterson. Yehl took numerous steps to ensure that Lamb and her attorney would have access to Department files. *Id.*, ¶ 5(f).

On January 22, 1997, Yehl sent Lamb a detailed report addressing the issues in her grievance and discussing the results of the City's investigation. Yehl's report concluded that reported instances of harass-

ment had been followed up, and that Lamb had not been the subject of any retaliation. Specifically, Yehl found that Lamb had not been evaluated for attendance and tardiness more harshly than her co-workers. Yehl also found that the reductions in job duties Lamb had claimed, *i.e.*, being removed from certain staff meetings and committees, were the result of considered personnel assignments, and not motivated by retaliation. *See* Letter from Robert (Sherman) Yehl, City Manager, to Rita Lamb, c/o Sheila Haley, Cordell & Haley, January 22, 1997 (Exh. R to Plaintiff's Response).

Lamb resigned her employment with the Department on February 7, 1997, and filed a complaint with the EEOC and Texas Commission on Human Rights on February 10, 1997. *See* Charge of Discrimination, February 10, 1997 (Exh. 38 to Moore Aff.). Lamb filed suit in this Court on June 7, 1999. In her amended complaint, Lamb alleges violations of Title VII in that she allegedly was subjected to sexual harassment constituting a hostile work environment while employed with the Department, and that she suffered retaliation for complaining about Peterson's conduct. *See* Plaintiff's First Amended Complaint [Doc. # 22]. Defendant moved for summary judgment on both claims on November 8, 2000.

## II. *SUMMARY JUDGMENT STANDARD*

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th

Cir.1994) (*en banc* ); *Bozé v. Branstetter,* 912 F.2d 801, 804 (5th Cir.1990). Material facts are those facts "that might affect the outcome of the suit under the governing law." *Smith v. Brenoettsy,* 158 F.3d 908, 911 (5th Cir.1998) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The facts are to be reviewed with all "justifiable inferences" drawn in favor of the party opposing the motion. *See Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir.1998) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts." *Laughlin v. Olszewski,* 102 F.3d 190, 193 (5th Cir.1996).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Smith,* 158 F.3d at 911. The burden then shifts to the nonmovant to demonstrate that summary judgment is inappropriate. *See Morris,* 144 F.3d at 380. This is accomplished by producing "significant probative evidence" that there is an issue of material fact so as to warrant a trial, *see Texas Manufactured Hous. Ass'n v. Nederland,* 101 F.3d 1095, 1099 (5th Cir.1996), *cert. denied,* 521 U.S. 1112, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997); *Taylor v. Principal Financial Group, Inc.,* 93 F.3d 155, 161 (5th Cir.1996); *Transamerica Ins. Co. v. Avenell,* 66 F.3d 715, 718–19 (5th Cir.1995); *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.1994), and that is "sufficient to support a jury verdict." *Morris,* 144 F.3d at 380; *accord Doe v. Dallas Indep. School Dist.,*

153 F.3d 211, 215 (5th Cir.1998). This burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See, e.g., Morris,* 144 F.3d at 380. Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden. *See id.* Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* Dispute about a material fact is genuine only if evidence is such that reasonable jury could return a verdict for nonmoving party. *See Stafford v. True Temper Sports,* 123 F.3d 291, 294 (5th Cir.1997); *Hanks v. Transcontinental Gas Pipe Line Corp.,* 953 F.2d 996, 997 (5th Cir.1992). In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *See McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.), *revised on other grounds upon denial of reh'g,* 70 F.3d 26 (5th Cir.1995); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc*), 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *See Little,* 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548).

### III. DISCUSSION [1]

#### A. Classification of Lamb's Sexual Harassment Claims and Quid Pro Quo Theory

Following the Supreme Court's decisions in *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the Fifth Circuit has noted the distinctions between different forms of sexual harassment. "At the first stop on the *Ellerth/Faragher* road map, courts are required to determine whether

---

1. Both parties have raised objections to the admissibility of summary judgment evidence provided by the opposing party. Plaintiff Lamb first objects to the affidavit of Linda Moore, claiming that the affidavit "teems with hearsay." Plaintiff's Response, at 18. Moore is the Personnel Specialist for the City. Moore gives a summary of Lamb's employment with the Department and the investigations that ensued from Lamb's complaints of sexual harassment. While the Court agrees with Lamb that Moore testifies to events beyond her personal knowledge in part, her hearsay statements are cumulative of documentary evidence and competent testimony of other Department/City employees before the Court. In any event, Moore's testimony is basically a summary of the Defendant's records and positions in the case. Lamb also objects of the affidavit of Daryl Bissett, claiming that the affidavit is not properly authenticated or admissible. *See* Affidavit of Daryl M. Bissett (Exh. D to Defendant's Record) ("Bissett Affidavit"). Lamb's contentions lack merit since the Bissett Affidavit is signed, made under oath and notarized. *Id.* at 4. Lamb also contends that certain statements in the affidavit, regarding the outcome of the Department's investigation of the "Big Kahuna" fax, are hearsay. Plaintiff's Response, at 18. The Court disagrees; Bissett participated in the investigation and, based on personal knowledge, he was competent to explain its progress. In any event, the statements to which Lamb objects are not material to the Court's analysis.

Defendant apparently objects to various portions of Plaintiff Lamb's affidavit and the deposition excerpts of Brye and Peterson submitted by Lamb. *See* proposed "Order on Defendants' Motion to Strike and Objections to Plaintiff's Summary Judgment Record." There is indication that Defendant filed a motion to strike. The proposed order does not state the grounds for Defendant's objections. Therefore, the Court considers all of Lamb's evidence to the extent relevant.

the complaining employee has or has not suffered a 'tangible employment action.' If [she] has, [her] suit is classified as a *'quid pro quo'* case; if [she] has not, [her] suit is classified as a 'hostile environment' case." *Casiano v. AT&T Corp.*, 213 F.3d 278, 283 (5th Cir.2000).

■ Lamb alleges she was subjected to a hostile work environment. However, the Court notes that at least some of Lamb's contentions more properly fit a *quid pro quo* sexual harassment theory. Lamb claims, for instance, that the terms and conditions of her employment were impacted, *not* because she suffered severe and pervasive sexual harassment, but because her supervisor gave her a bad performance evaluation (resulting in the failure to get a merit-based pay raise) and because he attempted to lodge a false complaint that Lamb herself had made obscene and harassing remarks.[2] *See* Lamb's Response, at 11.

If Lamb's claim is analyzed under the *quid pro quo* theory, then (as noted above) Lamb needs to show that a tangible employment action resulted from the improper conduct. A tangible employment action is defined as a "significant change in employment status." *Watts v. Kroger Co.*, 170 F.3d 505, 510 (5th Cir.1999). Examples of tangible employment actions include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (citing

*Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257). To the extent Lamb challenges Peterson's accusation that she engaged in misconduct, even though no investigation of her actions resulted, Peterson's conduct does not constitute an adverse employment action and Lamb's theory is not legally viable under Title VII.

■ To the extent that Lamb contends that Peterson denied Lamb a pay raise to punish her for not responding to his advances, this claim also would amount to a *quid pro quo* claim. In this instance, the alleged result would arguably constitute a tangible employment action. In this context, Defendant City contends that Lamb is time-barred from complaining about her denial of a pay raise. Defendant's Motion, at 18. Lamb was denied a raise in August 1995. She did not file her EEOC complaint until February 10, 1997. "A Title VII plaintiff must file a charge of discrimination with the EEOC no more than three hundred days after learning of an adverse employment decision in a referral state." *Messer v. Meno*, 130 F.3d 130, 134 (5th Cir.1997) (citing *Washington v. Patlis*, 868 F.2d 172, 175 (5th Cir.1989)). Therefore, Lamb is barred from now raising the issues of her 1995 performance evaluation and the denial of the associated potential pay raise.

Lamb resorts to the continuing violation theory to avoid the time-bar. This effort is unavailing. The continuing violation exception is an equitable exception invoked

---

**2.** Lamb claims that Peterson attempted to lodge false accusations that Lamb herself had engaged in sexual harassing behavior. In June 1996, Peterson notified Brye that Lamb had allegedly made certain inappropriate, sexually oriented comments regarding a cough drop or gum with a liquid center. Peterson states that one of the dispatchers, Rose Marie Valdez, brought the matter to his attention but did not want to file a report on the matter. Peterson Aff., ¶ 9. Peterson states that as Valdez's supervisor, he was required to notify Brye of the matter. *Id.* Police detective Daryl Bissett states that he was present when Lamb made the cough drop/gum comment, as well as other sexually oriented remarks. *See* Bissett Aff., ¶ 5(a)-(c). However, Lamb denies that she made such a comment. Lamb Aff., ¶ 12. Whether or not Lamb actually made the remark is thus in dispute. However, Brye chose not to investigate the incident, and no action was taken against any employee. Brye Aff., ¶ 9.

where "the unlawful employment practice manifests itself over time, rather than as a series of discrete acts." *Webb v. Cardiothoracic Surgery Associates of North Texas, P.A.*, 139 F.3d 532, 537 (5th Cir.1998) (citing *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 474 (5th Cir.1989)). In the case at bar, the City's denial of Lamb's pay raise in 1995 was a discrete act that clearly was sufficient to place Lamb on notice that she might be a victim of sexual harassment.[3]

### B. *Hostile Work Environment*

Plaintiff Lamb claims that because of Peterson's actions she was subjected to a hostile work environment. Defendant City contends that Lamb cannot make her *prima facie* case under this theory. According to the City, Lamb cannot show that Peterson's conduct was sufficiently severe or pervasive to affect a term or condition of employment, nor can she show that the City failed to promptly remedy any harassing or inappropriate conduct by Peterson. The City also argues that it is entitled to an affirmative defense, that it took reasonable care to prevent or correct any harassing behavior while Lamb unreasonably failed to take advantage of her employer's anti-harassment policy.

### 1. *Prima Facie* Case

A plaintiff "may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive working environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In order to state a claim for a sexually hostile work environment under Title VII, an employee must show that (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Shepherd v. Comptroller of Public Accounts of the State of Texas*, 168 F.3d 871, 873 (5th Cir.1999), *cert. denied*, 528 U.S. 963, 120 S.Ct. 395, 145 L.Ed.2d 308 (1999) (citations omitted). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399 (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971)). The challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived the conduct to be abusive. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

■ *Actionable Sexual Harassment.*– Lamb points to three aspects of Peterson's conduct that she contends made her work environment intolerable: first, Peterson's "hitting on her"-asking personal questions while standing close to her and using a suggestive tone of voice-in the initial months of her employment; second, Peterson's references, made once or twice in the summer of 1995, to the size of his male anatomy; and third, Peterson's placing the "Big Kahuna" fax near her desk in June 1996. *See* "Statement of Facts," Plaintiff's Response, at 1–9.

---

**3.** Even if the August 1995 evaluation and pay raise complaint were not time-barred, Lamb has not shown that her failure to receive a pay raise "resulted from [her] rejection of [her] supervisor's alleged sexual harassment." *Casiano*, 213 F.3d at 283. Defendant City claims that Lamb's sub-par performance evaluation was due primarily to her poor attendance/tardiness record. *See* Peterson Aff., ¶ 3; Exhs. F, G to Plaintiff's Response. Lamb has produced no evidence tending to show that Peterson in fact gave her a low score because she rebuffed his advances.

Despite Lamb's conclusory assertion in her July 11, 1996, grievance that Peterson's harassment had "escalated in severity" since June 1996, the record fails to reveal any subsequent instances of "harassment." Indeed, Lamb does not point to any events after June 1996. *See* Deposition of Rita Arlene Lamb (Exh. I to Defendant's Record) ("Lamb Deposition") (noting that Lamb cannot remember any specific instances of harassment after that date), at 199–201. In addition, the questionnaire Lamb completed at the City's request during its investigation of her complaints does not indicate any other incidents which might be construed to be sexually harassing behavior.[4] *See* Sexual Harassment/Sex Discrimination/Hostile Work Environment and Retaliation Complaint Form & Questionnaire (Exh. 22 to Moore Aff.).

In essence, then, Plaintiff Lamb complains of general flirtatious behavior and two specific comments over the course of two and a half years of her employment with the City. Such behavior does not rise to the level of actionable sexual harassment. As the Supreme Court and Fifth Circuit have reiterated, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Shepherd,* 168 F.3d at 874 (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). The "'mere utterance of an ... epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment.'" *Id.* (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367).

Peterson's behavior, while somewhat inappropriate, was not frequent, severe, or physically threatening. Indeed, the "Big Kahuna" fax was not even aimed at Lamb. It is uncontroverted that Peterson sent the fax as a joking reprimand to a (male) dispatcher who was watching television on the job. *See Long v. Eastfield College,* 88 F.3d 300, 309 (5th Cir.1996) (distinguishing the "mere offensive utterance" from "physically threatening or humiliating conduct"); *DeAngelis v. El Paso Police Officers Ass'n,* 51 F.3d 591, 593 (5th Cir.1995) (holding that "conduct that sporadically wounds or offends" is not so egregious as to alter the conditions of employment and destroy [women's] equal opportunity in the workplace). *Cf. Farpella–Crosby v. Horizon Health Care,* 97 F.3d 803, 806 (5th Cir.1996) (holding that supervisor's questions made two and three times a week about plaintiff's sexual activities constituted actionable sexual harassment).

Viewed objectively, none of Peterson's comments were of such severity that they reasonably interfered with Lamb's work opportunities or performance. Thus, the Court finds that Lamb has failed to meet the requirements of the *prima facie* case for hostile environment sexual harassment.

■ *Employer's Prompt Remedial Action.*–The Court alternatively concludes that Lamb has not met the fifth prong of her *prima facie* case, that the Department/City failed to take prompt remedial action once it knew of her complaints. To the contrary, the Department took prompt remedial action in both instances in which Lamb complained of Peterson's behavior. Lamb first complained of Peterson's conduct (his comments responding to her "big hands" remark) in January 1996. Al-

---

4. In her deposition, Lamb does allege that Peterson signed her up for a "healthy eating" seminar. Lamb Dep., at 199–201. The Court notes that Lamb never complained to the Department about this incident. In addition,

while Lamb believes that Peterson intended to make fun of her weight, there is no evidence that Peterson in fact signed up Lamb for the seminar.

though Peterson was not formally disciplined until March 1996, Brye did take immediate steps to substitute himself for Peterson as Lamb's supervisor.

In response to Lamb's second complaint, made on June 4, 1996, the Department again took prompt and aggressive action. The day after Lamb complained, Brye ordered an investigation by a fact finding commission. The commission obtained affidavits from Lamb, Peterson, and Marc Bumbera, the dispatcher to whom Peterson's fax was sent. The commission also performed a number of "experiments" to determine if a document falling off the fax machine could have landed in the position in which Lamb found the Big Kahuna fax (thus attempting to verify Peterson's claim that the fax had accidentally fallen from the machine and that he had not "placed" the fax by Lamb's desk). On June 7, Peterson was notified that formal disciplinary proceedings were being instituted against him. On June 14, Chief Griffith sent Peterson a written memo, reprimanding Peterson and imposing one day's suspension without pay. Peterson was also required to give Lamb both written and face-to-face apologies. *See* Moore Aff., ¶¶ 6(b). Chief Griffith himself also apologized to Lamb and told her that he would do everything he could to provide her with a "harmonious work environment." *See* Questionnaire, June 17, 1996 (Exh. 22 to Moore Aff.).

The City also responded to Lamb's July 11, 1996 grievance. Although Lamb complains that the City was not "prompt" because it did not issue the results of the investigation until January 1997, the Court finds that the City undertook an extensive investigation. *See* Moore Aff., ¶ 6(c); *Id.,* Exhs. 20–32; Yehl Aff., ¶ 5. It also appears that much of the delay was attributable to Lamb herself.[5]

The record is uncontroverted that the City took Lamb's complaints seriously and undertook to investigate them in a thorough and timely manner. Therefore, Lamb fails to meet the fifth prong of the *prima facie* case for hostile environment sexual harassment.

### 2. Affirmative Defense

The City claims that, even if Lamb were able to make a *prima facie* case of sexual harassment, it is entitled to the affirmative defense enunciated in *Faragher*. In a hostile environment case, an employer may claim an affirmative defense if "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and "the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities by the employer to avoid harm or otherwise." *Faragher,* 118 S.Ct. at 2293. Having found that Lamb failed to meet her burden to show a *prima facie* case, the Court need not reach this issue.[6]

---

5. For instance, Lamb did not return the City's Sexual Harassment/Sex Discrimination/Hostile Work Environment and Retaliation Complaint Form & Questionnaire until over a month after it had been issued to her. *See* Exhs. 20, 22 to Moore Aff. Lamb apparently declined to give a recorded statement to the City. *See* Letter from Robert Sherman Yehl to Rita Lamb, January 22, 1997, at 1. Lamb also insisted on investigating numerous City computer files for past complaints against Peterson. *Id.* at 2.

6. It is unclear whether Lamb unreasonably failed to avail herself of her employer's reme-

dies against sexual harassment. The City argues that Lamb was unreasonable in failing to report what she perceived to be Peterson's harassing remarks until months after they were actually made. The City also contends that Lamb failed to cooperate fully during the City's investigation following her July 11 grievance. However, Lamb indicated that she did not report Peterson's behavior immediately because she did not wish to cause trouble when she was relatively new to her job. Lamb Aff., ¶ 6. The Fifth Circuit has clarified that delay in reporting alone is not *per se* an "unreasonable failure" to take care.

## C. *Retaliation*

Title VII prohibits an employer from retaliating against employees who exercise their rights under the act. 42 U.S.C. § 2000e–3(a); 29 U.S.C. § 623(d). In order to establish a *prima facie* case of retaliation, a plaintiff must establish that: (1) she engaged in an activity protected by the statute, (2) an adverse employment action occurred, and (3) there was a causal connection between the participation in the protected activity and the adverse employment action. *See Burger v. Central Apartment Management, Inc.*, 168 F.3d 875, 878 (5th Cir.1999); *Dollis v. Rubin*, 77 F.3d 777, 781 (5th Cir.1995) (Title VII); *Ray v. Tandem Computers*, 63 F.3d 429, 435 n. 22 (5th Cir.1995). If Lamb successfully establishes a *prima facie* case, the burden then shifts to Defendant City to articulate a legitimate, nondiscriminatory reason for the allegedly retaliatory conduct, and then back to Lamb to prove that the proffered reasons are pretextual. *Ray*, 63 F.3d at 435.

Lamb claims that she suffered retaliation when (1) she was denied a merit-based pay raise in August 1995; (2) the City failed to take proper remedial action against Peterson in the aftermath of the "Big Kahuna" fax incident; and (3) the City failed to take remedial action after Lamb filed her July 11, 1996 grievance, resulting in Lamb's constructive discharge.[7] Plaintiff's Response, at 15.

■ Lamb was denied a pay raise after she received a low score on her performance evaluation in August 1995. As the City correctly notes, Lamb did not lodge any complaint about Peterson's behavior until January 1996. Thus, Lamb cannot show that her failure to receive a raise resulted from engaging in a protected activity. Even if Lamb could show causation, the City has articulated a legitimate, nondiscriminatory reason for Lamb's failure to receive a raise—her sub-par performance, namely tardiness and wasting time on the job. *See* Peterson Aff., ¶ 3; Exhs. F, G to Plaintiff's Response. Lamb has failed to show that the City's proffered reason is false or pretext for discrimination.

■ Lamb's allegation that the Department failed to take action against Peterson after she complained about his behavior is meritless in light of the summary judgment record. The City has produced extensive evidence detailing the investigations it undertook and the discipline Peterson received. Lamb's subjective feelings that Peterson was not given adequate discipline are not probative evidence, especially given the fact that no harassing behavior occurred after Peterson was disciplined in June 1996 (for the "Big Kahuna" fax). Lamb cites no authority for the proposition that failure to investigate a charge of discrimination or harassment, or

*Watts*, 170 F.3d at 510–11. *But see Scrivner v. Socorro Independent School District*, 169 F.3d 969 (5th Cir.1999) (holding unreasonable plaintiff's failure to complain, from the summer of 1995 until March 1996). In addition, while Lamb was perhaps not as cooperative as she might have been during the City's investigation, it is not likely that her dilatory behavior constitutes unreasonableness. *Cf. Scrivner*, 169 F.3d at 971–72 (finding unreasonable plaintiff who lied during employer's investigation, claiming that she had not been harassed).

7. Lamb apparently has dropped her allegations that she suffered retaliation in the reduction of her job duties and the more targeted evaluation of her attendance and tardiness. As the City notes, such actions would not constitute "adverse employment actions" necessary to state a claim of retaliation. *See Thomas v. Texas Dept. of Criminal Justice*, 220 F.3d 389, 394 n. 2 (5th Cir.2000); *Mattern v. Eastman Kodak*, 104 F.3d 702, 707 (5th Cir. 1997) (adverse employment actions are "ultimate employment decisions ... such as hiring, granting leave, discharge, promotion, and compensation").

an investigation result with which a complainant is not subjectively satisfied, constitutes an adverse employment action. Indeed, legal authority does not support the view that a plaintiff/employee could successfully claim retaliation simply because she was unhappy with the results of her employer's efforts to prevent and correct harassing behavior.

As a third basis for her retaliation claim, Lamb contends that she was constructively discharged after complaining about Peterson's behavior. This argument is essentially a rehash of her assertion that Defendant City failed to take action to discipline Peterson. *See* Letter from Rita Lamb to Sherman Yehl, City Manager, and Steve Griffith, Chief of Police, January 23, 1997 (Exh. 33 to Moore Aff.) (stating Lamb's belief that she had been "constructively discharged [due to] the City and the Police Department's refusal to adequately address [her] complaints of sexual harassment"). In order to claim constructive discharge, Lamb must demonstrate "a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment." *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 195 n. 7 (5th Cir.1996); *Landgraf v. USI Film Prods.*, 968 F.2d 427, 429 (5th Cir.1992), *aff'd*, 511 U.S. 244, 114 S.Ct. 1522, 128 L.Ed.2d 229 (1994). Lamb has failed to demonstrate that she was subjected to a hostile environment; thus, her constructive discharge claim also fails as a matter of law.

### D. *Damages*

Defendant City has raised several issues regarding the scope of Lamb's damages, arguing that Lamb's damages should be limited or barred via the doctrine of after-acquired evidence. *See* Defendant's Motion, at 23–26. Having found that Lamb's claims fail as a matter of law, the Court does not reach the issue of Lamb's damages.

### IV. *CONCLUSION*

Plaintiff Lamb's claim of hostile environment sexual harassment fails because she has not met her summary judgment burden to demonstrate a *prima facie* case. The conduct of which Lamb complains does not rise to the level of actionable sexual harassment. Moreover, Defendant City took prompt remedial action each time Lamb complained. Lamb's claim of retaliation also fails. First, Lamb cannot demonstrate that her failure to receive a pay raise resulted from her complaints about Peterson's behavior. Second, Lamb cannot show that the City failed to address her allegations of harassment. Third, Lamb cannot show that she was constructively discharged. It is therefore

**ORDERED** that Defendant's Motion for Summary Judgment [Doc. # 49] is **GRANTED**.

The Court will enter a separate final judgment.