**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 6, 2009

Charles R. Fulbruge III
Clerk

No. 08-60666

GWENDOLYN D DONALDSON

Plaintiff-Appellant

v.

CDB INC, doing business as Popeye's

Defendant-Appellee

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 2:07-CV-122

Before BARKSDALE, DENNIS, and ELROD, Circuit Judges.

PER CURIAM:[*]

Gwendolyn Donaldson appeals the summary judgment awarded CDB, Inc., d/b/a Popeye's Chicken and Biscuits, against her Title VII gender-based claims for hostile-work environment, retaliation, and constructive discharge. At issue is whether there are genuine issues of material fact for her claims that: the comments by her general manager, McLaurin, met the "severe or pervasive" standard necessary to establish a hostile-work environment; McLaurin engaged in retaliatory conduct for her filing an EEOC complaint; and, she was

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

constructively discharged, because working conditions were so intolerable that she felt compelled to resign. Also at issue is whether, for the hostile-work-environment claim, CDB established an affirmative defense under the Supreme Court's companion *Ellerth/Faragher* decisions. We AFFIRM the judgment on the constructive-discharge claim, VACATE the judgment for the hostile-work-environment and retaliation claims, and REMAND.

## I.

Consistent with the standard of review for a summary judgment, discussed *infra*, the summary-judgment record is viewed in the light most favorable to Donaldson, the non-movant. The following facts are primarily from Donaldson's deposition. (As discussed *infra*, little evidence is provided by CDB concerning McLaurin's conduct.) We take no position on the veracity of Donaldson's deposition; instead, the facts are presented solely for deciding, for each claim, whether Donaldson has created a requisite genuine issue of material fact.

CDB hired Donaldson on 13 January 2006 as a crew member in its Popeye's restaurant on Highway 98 in Hattiesburg, Mississippi. When she was hired, the general manager of the Highway 98 store was Amos; that April, McLaurin replaced Amos as general manager.

Before McLaurin's arrival, and after only five weeks on the job, an assistant manager informed Donaldson that Amos had decided to recommend Donaldson for the next available assistant-manager position. Donaldson became concerned about her potential promotion when McLaurin became the general manager. When she confided this worry in a co-worker, he informed her the only way to become assistant manager would be to "snitch on someone" or "sleep with" the area supervisor.

Shortly after his arrival, McLaurin asked Donaldson about her personal relationship with Patterson, another supervisor who had been encouraging McLaurin to promote Donaldson. McLaurin noted he would have a "bad taste in his mouth" if Patterson and Williams, the area supervisor, both sought promotions for female employees with whom they had engaged in sexual relations.

Approximately a month into McLaurin's tenure at the Highway 98 restaurant, McLaurin began making sexually offensive comments, both to other female employees (in Donaldson's presence) and to Donaldson. He repeatedly asked a female crew member whether she had turned the television off because he had forgotten to do so when leaving her bed in the morning; made jokes about her physical features; and, asked her once whether it was her "time of the month because something smelled stank [sic]". That employee eventually quit because she could not stand McLaurin and his harassment.

McLaurin also relayed a comment to Donaldson that he had made on Donaldson's day off, in which he noted that there were flies in the lobby where another female employee was eating lunch, and he "couldn't understand where they were coming from until [that employee] opened her legs and all the flies swarmed between her legs". Additionally, he made hand gestures simulating oral sex to a female employee while that employee was conversing with Donaldson; made a comment to Donaldson that it looked like a female employee's water had broken (she was pregnant at the time), when he spilled cole slaw and white juice dripped down the side of the container; and, told that employee that, henceforth, he was only going to employ overweight women

3

because "they work slow but at least they show up for work". (That employee related this to Donaldson.)

Often, McLaurin's sexually suggestive comments were made generally to the whole staff. When a female with attractive physical features entered the store, he would yell "Code Red", which was a signal for the other male employees to note the presence of the woman. He would also comment about his sexual performance, telling fellow crew members he "only had two minutes for a woman and she better hurry up and get hers because he was going to get his". Finally, he referred to his private parts as Georgia Pacific (log trucks), and commented every time a Georgia Pacific truck passed the restaurant.

Concerning McLaurin's comments addressed specifically to Donaldson, many involved her relationship with her boyfriend. Upon Donaldson's limping into work, after suffering a work-related injury to her foot, McLaurin noted that Donaldson's boyfriend must have attempted to put her foot over her head to "get it in". Once, while Donaldson was on the floor, attempting to enter the code to unlock the store's safe, McLaurin accused her of working slowly and stated: "I bet you ain't that slow at other things you do". When, because of her injured foot, Donaldson rolled over to get off the floor, McLaurin commented: "I see what you and [your boyfriend] be [sic] doing at night".

McLaurin also disparaged Donaldson's physical appearance. After overhearing Donaldson inform a co-worker that she was trying to "get her life right", he told her that she "needed to get her body right" because she was "bad built". He repeatedly made comments suggesting she buy new bras, telling her she needed to do so before she reported to assistant-manager training, discussed

below. Referring to her breasts, he would also tell her to move "those things" out of the way when working together in a cramped area of the store.

Donaldson was recommended for the assistant-manager position, and reported to CDB's Popeye's store on Highway 49 for management training on 19 June 2006. Part of the materials new managers were required to learn for an end-of-training test included a home-study course on employment law covering, *inter alia*, the Civil Rights Act, sexual harassment, and fair labor practices. Donaldson passed the test, but did not read the employment-law materials.

On several occasions during Donaldson's training at the Highway 49 store, McLaurin appeared at, drove past, or telephoned, the store, at one point coming behind the counter and silently watching Donaldson's activity for between 30 minutes to an hour. While this conduct was not sexual in nature, Donaldson found it menacing and uncomfortable.

When Donaldson returned to the Highway 98 store in August 2006 as an assistant manager, the harassment increased. The regular comments regarding "code red" and "Georgia Pacific" continued, and McLaurin again told her to get a new bra, to go with her new assistant-manager's shirt. Perhaps the most egregious incident occurred one night when she and a female co-worker were closing the store. Donaldson had mentioned previously to the co-worker that she thought the manager of the Spee Dee Lube Shop across the street liked her. The co-worker, while talking on her cell phone to McLaurin, told Donaldson that McLaurin wanted Donaldson to "ride speedy man so he [McLaurin] can get a free oil change". Donaldson took the phone, and McLaurin repeated the comment to her. When Donaldson next saw McLaurin, she asked him to clarify what he had meant, to which he replied: "You are a woman, you know how to get

what you want out of a man, so go over there to Speedy Dee and do it so I can get an oil change and [a co-worker] can too".

Throughout this time period, no one ever inappropriately touched Donaldson, and neither McLaurin nor anyone else requested that she perform sexual acts in exchange for a promotion. In a conversation with McLaurin, however, in which she told him he had "crossed the line" with his sexually suggestive comments, he responded: he did not care what she said; he knew the law; and, in that regard, "you can say what you want to say but you can't touch".

When she told him he was mistaken about this, he responded that she could do whatever she wanted, but threatened her with "one day on the schedule"–meaning he would only assign her to work one day in a week–if she took action. When Donaldson would defend herself against his harassing comments, he would use this "one day schedule" threat against her.

Donaldson called area-supervisor Williams in August 2006 to inform him she was having work-related problems with McLaurin; she did not, however, mention any sexual-harassment claims on the advice of a co-worker, who informed her Williams would consider her a "snitch" if she did. During this conversation, Donaldson informed Williams that McLaurin called her "stupid"; told her she did not know her job; and, informed her he did not care about her training, he would run the store the way he wanted. Williams promised to bring up the intimidation allegations at the next manager's meeting, but never did.

Donaldson contacted the EEOC to file a sexual-harassment claim against McLaurin in early September 2006. The EEOC advisor inquired whether Donaldson had informed anyone at CDB of the harassment; Donaldson replied

she had not. The EEOC advisor would not file a complaint, informing Donaldson she must give CDB an opportunity to investigate and remedy the allegations.

Therefore, on 18 September, Donaldson notified the administrative assistant to CDB President Chunn of the alleged harassment. Three days later, after CDB had neither contacted Donaldson to notify her it had received her complaint nor initiated an investigation, she filed a charge of discrimination with the EEOC.

Upon learning of the EEOC charge, Chunn, on 22 September, retained outside legal counsel to investigate Donaldson's claim. Because of the pending claim, CDB management thought it would be inappropriate to discuss the case with Donaldson. Instead, they found it more appropriate to respond formally to the EEOC. Chunn also instructed Williams and McLaurin to treat Donaldson no differently than any other employee, as if she had not made a complaint.

Because CDB is a close-knit working environment, news of the complaint spread quickly. Donaldson never asked any other crew members to "sign papers" regarding the investigation. She did, however, ask two female co-workers to talk to the EEOC investigator when she visited the area, which they said they would do.

On 11 November 2006, McLaurin called a meeting exclusively for all female employees of the store. He asked Donaldson to post a notice about the meeting, telling her its purpose was to discuss a recent poor evaluation the store had received from Popeye's national franchisor. The meeting, however, had little to do with the evaluation. Instead, after a co-worker broached the subject of Donaldson's EEOC complaint (McLaurin did not initiate the discussion), McLaurin berated Donaldson in front of the rest of the female staff; called her

7

the devil; and, accused her of encouraging other female employees to sign statements against him for the EEOC. He told Donaldson: "You are trying to bring me down and you wouldn't have that red shirt [the color worn by assistant managers] if it wasn't for me". Donaldson believes the meeting was actually called so that McLaurin could "attack and humiliate" her and "intimidate any potential witnesses against him". She left the meeting visibly upset and crying.

Donaldson missed approximately 13 days of work over the next two months, because of an increase in pain from the above-described foot injury she had received early in her employment, the stress she felt following the 11 November meeting with McLaurin, and the sense that she "couldn't go back in there". During that time, on 18 December, bonus checks were issued to the store employees; Donaldson's bonus, however, was withheld for five days, until 23 December. Donaldson believes this delay was in retaliation for her filing the EEOC complaint.

Likewise, in the first week of January 2007, area-supervisor Williams, Patterson (another supervisor), and McLaurin held two meetings with Donaldson to discuss her work performance. At the first meeting, they asked her whether she was happy with her job and expressed concerns with her job performance and increasing absenteeism. At the second meeting, the three men questioned Donaldson about "cash shortages" in one of the registers, even though McLaurin knew Donaldson had not been working on the register at the time of the shortages. She concluded they were threatening her with criminal charges, because she knew CDB usually attempted to charge someone with a crime when money was missing.

Shortly after these meetings, Donaldson submitted on 11 January 2007 a doctor's note and requested medical leave. On 1 February, while still on leave, Donaldson filed a second charge of discrimination with the EEOC, claiming employer retaliation as a result of the 11 November store meeting and the subsequent meetings with management regarding her work performance. On 7 March, without having returned to work, Donaldson tendered her resignation.

On 11 May, the EEOC issued a Notice of Right to Sue to Donaldson. She filed this action on 18 June 2007, raising Title VII claims for hostile-work environment, constructive discharge, and retaliation, as well as state-law tort claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence *per se*.

After the close of discovery, CDB moved for summary judgment on all claims. On 8 July 2008, the motion was granted.

## II.

A summary judgment is reviewed *de novo*. *E.g.*, *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009). All evidence must be viewed in the light most favorable to the non-movant. *E.g.*, *id.*

A summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law". FED. R. CIV. P. 56(c). Under this standard, "[a] factual dispute is deemed 'genuine' if a reasonable juror could return a verdict for the nonmovant and a fact is considered 'material' if it might affect the outcome of the lawsuit under the governing substantive law". *Cross v. Cummins Engine Co.*,

993 F.2d 112, 114 (5th Cir. 1993) (quoting *Beck v. Somerset Tech., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989)).

The summary-judgment record includes Donaldson's deposition, discussed *supra*. The only evidence of McLaurin's account of the events is a two-page affidavit in which he summarizes Donaldson's employment with CDB, denies he raised the issue of her EEOC complaint at the 11 November meeting, and confirms he was present at the January 2007 meetings during which Donaldson's job performance was discussed.

As noted, at issue is whether there are genuine issues of material fact for Donaldson's claims that: McLaurin's conduct established an environment that was sufficiently "severe or pervasive" to establish a hostile-work environment; McLaurin retaliated against her for filing the EEOC complaint; and she was constructively discharged because working conditions were so intolerable that she felt compelled to resign. (Donaldson did not oppose CDB's summary-judgment motion on her state-law claims; nor, on appeal, does she challenge their dismissal.)

Section 703(a) of Title VII provides that an employer may not "fail or refuse to hire or to discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex". 42 U.S.C. § 2000e-2(a)(1). *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-66 (1986), distinguished between "*quid pro quo*" sexual harassment (in which the grant or denial of employment advancement, such as a promotion or raise, depends upon whether an employee acquiesces to unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature) and "hostile

environment" sexual harassment (in which the harassment creates a hostile or abusive working environment, but is not necessarily linked directly to an economic *quid pro quo*). Both were found cognizable under Title VII.

Later, in the companion cases of *Ellerth* and *Faragher*, the distinctions between these two types of a sexual-harassment claims under Title VII were further defined. With *quid pro quo* harassment–when a supervisor's harassment culminates in a "tangible employment action", such as "discharge, demotion, or undesirable reassignment"–an employer is subject to vicarious liability, and no affirmative defense is available. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998). When, however, an employer is subject to potential vicarious liability on a hostile-environment claim, an employer may raise an affirmative defense to liability, by showing: (1) the employer exercised reasonable care to prevent and correct promptly any sexually-harassing behavior; and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm or otherwise. *See Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807; *see also Casiano v. AT&T Corp.*, 213 F.3d 278, 283-84 (5th Cir. 2000).

## A.

Donaldson claims she was constructively discharged from her employment at CDB. Such discharge has been deemed actionable under Title VII as a "tangible employment action". *See Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 410 n.15 (5th Cir. 2002). To establish constructive discharge, a plaintiff must show the "working conditions were so intolerable that a reasonable employee would feel compelled to resign". *Lauderdale v. Tex. Dep't of Crim.*

*Justice, Institutional Div.*, 512 F.3d 157, 167 (5th Cir. 2007) (citation omitted). Although a plaintiff is not required to demonstrate an employer intended to force her resignation, proving constructive discharge requires a greater degree of harassment than a hostile-work-environment claim. *Id.* Factors in concluding whether an employee was constructively discharged include:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status].

*Id.* (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

The district court concluded that Donaldson had not provided the requisite evidence to survive summary judgment against her constructive-discharge claim. Essentially for the reasons stated by the district court, we agree that the earlier-described summary-judgment evidence, while sufficient to raise a genuine issue of material fact with respect to the hostile-work-environment claim (discussed *infra*), does not meet the "greater degree of harassment" necessary for a viable constructive-discharge claim. *See Donaldson v. CDB, Inc.*, No. 2:07-cv-122-KS-MTP, 2008 WL 2704829, at *6 (S.D. Miss. 8 July 2008).

B.

Donaldson also claims she has presented sufficient evidence (created a genuine issue of material fact) to survive summary judgment on her hostile-work-environment claim. As our court has noted, a sexually-hostile-work-environment claim "is not a trivial matter":

> Its purpose is to level the playing field for women who work by preventing others from impairing their ability to compete on an

12

equal basis with men. . . . A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace. . . . [A] hostile environment claim, enforceable where working conditions have palpably deteriorated because of sexually hostile conduct, aims to enforce equality, not preference.

*DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995).

To establish a *prima facie* case of hostile-work-environment supervisor harassment, a plaintiff must show: "(1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a term, condition, or privilege of employment". *Lauderdale*, 512 F.3d at 163 (internal quotation marks and citation omitted). To affect a term, condition, or privilege of employment, the harassing conduct "'must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment'". *Aryain v. Wal-Mart Stores of Tex., LP*, 534 F.3d 473, 479 (5th Cir. 2008) (quoting *Lauderdale*, 512 F.3d at 163) (alteration in original). The work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so". *Id.* at 479. (quoting *Faragher*, 524 U.S. at 787).

Accordingly, determining whether a hostile-work environment exists takes into account the totality of the circumstances, including such factors as: (1) the frequency of the conduct; (2) its severity; (3) the degree to which the conduct is physically threatening or humiliating; and (4) the degree to which the conduct unreasonably interferes with an employee's work performance. *See Septimus v.*

*Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005). As noted *supra*, in response to a hostile-work-environment claim, the defendant may assert the *Ellerth/Faragher* affirmative defense.

1.

The district court determined that Donaldson had not presented sufficient evidence to create a genuine issue of material fact regarding the severity or pervasiveness of the alleged harassment. Needless to say, there is no mathematical formula to determine whether conduct is sufficiently severe or pervasive to establish a hostile-work-environment claim. On the other hand, the summary-judgment record establishes a genuine issue of material fact for this claim.

First, McLaurin's actions specifically toward Donaldson amounted to more than just "rude or offensive comments, teasing, or isolated incidents" that would not rise to the level of actionable harassment. *Hockman v. Westward Commc'ns LLC*, 407 F.3d 317, 326 (5th Cir. 2004). For the five months between McLaurin's arrival at the Highway 98 restaurant and Donaldson's filing her first EEOC complaint, Donaldson presents evidence concerning the pervasive nature of McLaurin's sexually-suggestive comments regarding both her physical appearance and her relationship with her boyfriend. Moreover, although calling her "stupid" and ignorant about the requirements of her job, and repeatedly driving past, appearing at, and telephoning, the store where she received assistant-manager training were, of course, not sexually-charged actions, when viewed in the totality of the circumstances, they lend support to the existence of a genuine issue of material fact for whether Donaldson was the victim of an abusive working environment.

There is no evidence McLaurin ever touched Donaldson inappropriately, propositioned her for sex, or implied that her job was dependent upon their having sexual relations. Nevertheless, the material fact issues for the hostile-work-environment claim are reflected by McLaurin's comment to Donaldson that he could say to her anything he pleased, "so long as I don't touch". McLaurin's understanding of the law is oversimplified, to say the least. Physical touching is not a requirement in a hostile-work-environment claim, so long as the evidence establishes conduct that is so severe or pervasive as to affect a term, condition, or privilege of employment.

Second, the comments made to other female employees and to the staff as a whole were not merely "offhand remarks". Our court has long held that harassment does not have to be directed toward the plaintiff to be considered for a hostile-work-environment claim. *Rogers v. EEOC*, 454 F.2d 234, 236-239 (5th Cir. 1972), *disapproved of on other grounds by EEOC v. Shell Oil Co.*, 466 U.S. 54 (1984).

While *Rogers* was decided in the context of race discrimination, this principle has been applied in the contexts of both race and sex by other circuits. In *Jennings v. University of North Carolina*, 482 F.3d 686, 695-96 (4th Cir. 2007) (en banc), the Fourth Circuit found, in the context of a Title IX action, that a coach's comments to the plaintiff as well as other female players were actionable because "sexually charged comments . . . even if not directed specifically to the plaintiff, are relevant to determining whether the plaintiff was subjected to sex-based harassment". *See also Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir. 1999) (concluding the district court erred when it deemed irrelevant the "overwhelming evidence" the plaintiff had proffered of discriminatory conduct

towards other black employees in addition to himself); *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033 (9th Cir. 1998) (holding, in the context of Title VI, that racist attacks "need not be directed at the complainant in order to create a hostile . . . environment"). Our court implicitly approved of this in the Title VII context when it noted, in *Waltman v. International Paper Co.*, 875 F.2d 468, 477 & n.3 (5th Cir. 1989), that sexually explicit grafitti on the walls of plaintiff's employment site were relevant to her hostile-work-environment claim, even though not all of it was directed at her.

As noted above, determining whether a claim establishes conduct sufficiently "severe or pervasive" depends on the totality of the circumstances. Disaggregating the claims "robs the incidents of their cumulative effect", *Jackson*, 191 F.3d at 660; just as "'[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, . . . similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario'". *Id.* (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990)).

Our precedent supports holding Donaldson created a genuine issue of material fact for whether she was subjected to a hostile-work environment. For example, in *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803 (5th Cir. 1996), our court upheld a district court's refusal to render judgment as a matter of law for the plaintiff's employer, after a jury found the employer liable on a hostile-work-environment sexual-harassment claim. *Id.* at 805. In that action, the plaintiff alleged her supervisor, director of nursing at the nursing home where she was employed, frequently commented on her sexual life and inquired about her sexual activity. *Id.* She claimed he made comments of this nature to her

about two or three times a week, for example: attributing her large number of children to a proclivity to engage in sexual activity; joking to a group of people at the work facility that plaintiff did not know how to use condoms; and frequently questioning both her and a co-worker about where they had been the night before, whether they had taken men home, and whether they "got any". *Id*. The plaintiff also complained of hostile treatment by the director that was not overtly related to her gender. *Id*.

Our court, in upholding the district court's refusal to grant judgment as a matter of law, noted: "[T]here is substantial evidence from which the jury could have concluded that [the director's] comments and questions were sufficiently severe and pervasive as to alter the conditions of employment and create an abusive working environment". *Id*. at 806; *cf. Long v. Eastfield Coll.*, 88 F.3d 300, 309 (5th Cir. 1996) (finding a single joke involving condoms insufficient to create a hostile-work environment).

Our court has upheld summary judgment for the employer in situations in which the harassment was not as pervasive as in this action. For example, in *Hockman*, our court upheld summary judgment for the employer when the plaintiff alleged that, over the course of a year and a half, a male co-worker: "(1) . . . once made a remark to [plaintiff] about another employee's body, (2) . . . once slapped her on the behind with a newspaper, (3) . . . 'grabbed or brushed' against [her] breasts and behind, (4) . . . once held her cheeks and tried to kiss her, (5) . . . asked [her] to come to the office early so that they could be alone, and (6) . . . once stood in the door of the bathroom while she was washing her hands". 407 F.3d at 328.

Likewise, in *Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871 (5th Cir. 1999), our court upheld summary judgment for the employer on a hostile-work-environment claim when, over a two-year period, the plaintiff alleged her male co-worker: once stood at her desk and remarked "your elbows are the same color as your nipples"; once said "you have big thighs" while simulating looking under her dress; stood over her desk on several occasions and attempted to look down her clothing; touched her arm and rubbed her shoulder on several occasions; and, on two occasions, patted his lap and said "here's your seat", after she arrived late for an office meeting. *Id.* at 872. The plaintiff affirmed that, beyond these allegations, she had a friendly relationship with the co-worker both at, and outside of, work. (The plaintiff was engaged to the co-worker's brother-in-law.) *Id.*

While perhaps these incidents are similar in severity to those presented by Donaldson, the regular, pervasive nature of the incidents in this action, coupled with the limited time period within which this took place (five months), likens her situation more to that in *Farpella-Crosby* than in *Hockman* or *Shepherd*. Further, unlike in *Shepherd*, Donaldson and McLaurin did not have a friendly relationship outside of the incidents at issue; Donaldson was so upset about the events—culminating in the 11 November meeting—that she missed several days of work because she "couldn't go back in there".

In sum, analyzing the alleged harassment in this action under our precedent, and viewing the claim under the requisite totality of the circumstances—noting McLaurin's comments to Donaldson, to other female employees, and to the staff as a whole, as well as the abbreviated time frame in

which they took place—we conclude that Donaldson has created a material-fact issue on whether the comments were actionably "severe or pervasive".

2.

The district court also concluded that, even assuming Donaldson had created a material fact issue for the hostile-work-environment claim, it would still fail because CDB successfully established its *Ellerth/Faragher* affirmative defense. We disagree.

After being told initially by the EEOC that she must first try to resolve her complaint internally, Donaldson attempted to do so on 18 September 2006, by informing the administrative assistant to the president of CDB of her claims. That assistant states that she immediately informed Chunn, the president, about the complaint. Three days later, however, Donaldson had not heard anything from CDB regarding the status of her complaint. At that time, on 21 September, Donaldson filed the formal EEOC charge; and, only when Chunn received the EEOC complaint, on 22 September, did he contact outside counsel with instructions to investigate the claim.

As noted *supra*, an employer must establish *both* prongs of the *Ellerth/Faragher* affirmative defense in order to avoid liability: (1) the employer exercised reasonable care to prevent and correct promptly any sexually-harassing behavior; *and* (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm or otherwise. *See Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.

CDB had a "Crew Member Handbook" which discussed CDB's policies, including for sexual harassment. The handbook instructed employees to discuss

harassment issues with their managers or, if that was not possible, to discuss these issues with their supervisor or owner. Donaldson signed a "Handbook Agreement", indicating she understood these policies. Therefore, CDB had procedures to address these types of issues.

The question, accordingly, is two-fold: did CDB, upon receiving the complaint, take reasonable steps to remedy the harassment; and did Donaldson "unreasonably" fail to take advantage of internal procedures for addressing her harassment complaint when she waited only three days to file her complaint with the EEOC. Again, the *Ellerth/Faragher* defense being conjunctive, the employer bears the burden on both elements. *See Aryain*, 534 F.3d at 483.

Primarily contested is whether the second prong of the affirmative defense is satisfied: that is, whether Donaldson unreasonably failed to take advantage of internal procedures for addressing her complaint when she waited only three days to file her EEOC complaint. In other cases discussing the second prong, our court has held it was unreasonable for a plaintiff not to make a second internal complaint if the first was not promptly addressed. *See, e.g.*, *Lauderdale*, 512 F.3d at 164-65 (holding plaintiff was unreasonable in not pursuing any other avenue available under company policy for reporting harassment after she reported to her immediate supervisor and he expressed an unwillingness to act); *see also Wyatt*, 297 F.3d at 413 (holding it was unreasonable for plaintiff not to report the harassment to another person listed on the employer's reporting policy after reporting her supervisor's harassment to his supervisor proved ineffective).

The CDB handbook outlined a process for reporting harassment internally: first, to the manager; then, the area supervisor or the owner. Donaldson could

not have reported the harassment to her manager (McLaurin), because he was the person against whom the harassment was charged; and, as described, McLaurin had threatened her on previous occasions with the "one day schedule" if she took action protesting his behavior. As discussed, reporting to Williams, an area supervisor, on non-harassment issues had proven ineffective, and Donaldson had been warned by a co-worker about being labeled a "snitch" if she mentioned any sort of sexual harassment to Williams. Therefore, her only outlet for reporting this harassment appeared to be the owner, and she availed herself of this internal procedure on 18 September.

Accordingly, there is a genuine issue of material fact whether her failure to file a successive internal complaint was unreasonable, as she had already reached the top of the chain of command. There is also a material fact dispute regarding whether Donaldson unreasonably failed to avail herself of the internal-complaint process by waiting only three days between filing her complaint with Chunn and going back to the EEOC.

Along this line, Donaldson does *not* maintain that CDB failed to notify her of the complaint, conduct an investigation, and come to a satisfactory resolution in the three days between the filing of the two complaints. Rather, Donaldson asserts that, after a failure to receive *any communication* from CDB in this time period, she resorted to the EEOC process.

Because a material fact issue remains with regard to Donaldson's reasonable pursuit of internal procedures, it is not necessary to address whether CDB took reasonable care to prevent and correct the harassing behavior. We note, however, that the parties vigorously dispute the degree to which CDB took action in conducting its own investigation once the EEOC complaint was filed.

Chunn, the owner, states in his affidavit: immediately upon learning of the complaint, he contacted outside legal counsel to investigate Donaldson's claim; and, they conducted a full investigation in responding to the EEOC charge. Along this line, CDB states in its brief on appeal: multiple witnesses were interviewed; and its counsel was in repeated contact with the EEOC during the investigation. Donaldson disputes this, claiming the EEOC file reveals that the only "investigation" CDB undertook was to interview McLaurin and Williams, who, of course, denied the claims. In short, although we need only find a genuine issue of material fact for one of the *Ellerth/Faragher* elements, Donaldson has established that material fact issues exist with respect to both.

C.

Finally, Donaldson claims McLaurin retaliated against her after she filed the EEOC complaint. *See* 42 U.S.C. § 2000e-3(a). The district court concluded that she had failed to create a material fact issue.

To establish a *prima facie* case of retaliation, a plaintiff must show: (1) she participated in protected activity under Title VII; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse employment action. *E.g.*, *Aryain*, 534 F.3d at 484. If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the employment action. *Id.* If the employer meets this burden, the burden shifts to the plaintiff to prove the employer's reason is pretext for the actual retaliatory purpose. *Id.*

It is undisputed that Donaldson engaged in protected conduct by filing an EEOC complaint. The district court held, however, that Donaldson had not

created a material fact issue for the second prong of the test: that an "adverse employment action" was taken against her.

In *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the Court held: in order to prove an adverse employment action, a plaintiff need not show the employer made an "ultimate employment decision"; instead "a plaintiff must show that a reasonable employee would have found the challenged action *materially adverse*, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination". *Id.* at 68 (internal citations and quotation marks omitted, emphasis added). This decision abrogated our court's previous approach, which required showing an "ultimate employment decision", such as "hiring, granting leave, discharging, promoting, and compensating" to establish a *prima facie* retaliation claim. *See Aryain*, 534 F.3d at 484 n.9; *see also Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997). The district court failed, however, to apply *Burlington Northern*.

While *Burlington Northern*, of course, established a less demanding standard for judging whether conduct is actionable as retaliation, the Court noted: "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience". *Burlington N.*, 548 U.S. at 68. Rather, prohibited employer actions are those "that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers". *Id.* (internal quotation marks and citation omitted).

Donaldson's primary challenged adverse employment action is the earlier-described 11 November meeting called by McLaurin. She maintains McLaurin

23

called the meeting to "attack and humiliate" her, and "intimidate any potential witnesses against him". She asserts the meeting was clearly called in retaliation for her filing the EEOC charge.

CDB, in turn, asserts that, even if Donaldson could establish a *prima facie* case of retaliation, it has shown a legitimate business purpose for the challenged adverse employment action. It notes that the 11 November meeting was called to address McLaurin's restaurant's failing evaluation, and Donaldson admits that was the *stated* purpose of the meeting. Further, it contends the fact that an employee other than McLaurin raised the issue of Donaldson's EEOC complaint is not enough to establish pretext.

Donaldson, of course, counters that the stated purpose of the meeting was merely pretext for McLaurin's actual goal of calling all the females of the staff together in order to attack her for filing the EEOC charge. Indeed, CDB's explanation for the purpose of the meeting has varied over the course of this action. As noted, Donaldson stated at her deposition that McLaurin asked her to post a notice requiring all female employees to attend a mandatory meeting, ostensibly "[b]ecause we failed another evaluation". In its response to Donaldson's second EEOC charge, dated 20 April 2007, CDB states the purpose of the meeting was to allow female employees to "voice any concerns they might have about management and the workplace". Later, on 22 February 2008, in its response to Donaldson's first set of interrogatories and requests for admissions, CDB stated the meeting was held to discuss general employee morale.

Whatever the stated purpose of the meeting, it was called *only* for the female staff members. If its purpose was to discuss a poor evaluation, or concern

about management, or employee morale, it is questionable, to say the least, why the male employees would not be included in such a discussion.

While pre-*Burlington Northern*, our court rejected the notion that retaliatory harassment could be sufficiently adverse to be considered actionable, *see Mattern*, 104 F.3d at 707, the new, *Burlington Northern* standard makes clear that a genuine issue of material fact exists for whether the conduct against Donaldson at the 11 November meeting was such that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination". *Burlington N.*, 548 U.S. at 68.

Further, in addition to the 11 November meeting, Donaldson maintains her bonus check was withheld for five days and she was implicitly threatened with criminal charges in retaliation for her filing the EEOC claim. In the light of these contentions, and considering McLaurin's conduct during the 11 November meeting, and Donaldson's assertion about the severe effect that the incident had on her (stating she "couldn't go back in there"–the store–after the meeting), we hold that Donaldson has created a material fact issue on whether the meeting was a retaliatory measure against her filing an EEOC claim; and, if so, whether it rises to the level of an "adverse employment action".

## III.

For the foregoing reasons, the judgment on the constructive-discharge claim is AFFIRMED; the judgment on the hostile-work-environment and retaliation claims is VACATED; and this matter is REMANDED to district court for further proceedings consistent with this opinion.

AFFIRMED IN PART; VACATED IN PART; REMANDED.