# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 4, 2010

Lyle W. Cayce
Clerk

No. 10-40342
Summary Calendar

JOSE L. HINOJOSA,

Plaintiff-Appellant,

versus

CCA PROPERTIES OF AMERICA, LLC,
Doing Business as Corrections Corporation of America,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 5:07-CV-97

Before DAVIS, SMITH, and SOUTHWICK, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Jose Hinojosa appeals a summary judgment for CCA Properties of Am-

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-40342

erica, LLC ("CCA"), on his claims that he was discriminated against when he was allegedly constructively discharged. Because Hinojosa cannot show that he was constructively discharged, we affirm.

I.

Hinojosa worked as a warden from 1987 through August 2006 at a detention facility in Laredo, Texas, operated by CCA. At retirement in 2006, he was 62 years old. The events leading to his retirement began in May or June 2006, when an employee at the Laredo facility complained that Hinojosa was allowing another employee verbally to abuse and sexually to harass the staff. CCA assigned Ruth Bellinger to investigate the complaints by interviewing other employees. She reported that morale was low, that Hinojosa was not at the facility as much as he was supposed to be, that he refused to control the offending employee, that favoritism was common, and that employees feared retaliation for complaining.

Shortly thereafter, the Laredo facility's business manager called CCA headquarters and accused Hinojosa of arriving late and leaving early, cashing personal checks from the facility's inmate petty cash fund, and misreporting his reimbursable gasoline and food expenses during official travel. In response, CCA sent two investigators to audit the facility's finances and to investigate the other complaints against Hinojosa.

The investigators arrived on August 1 and met Hinojosa in the parking lot, where they informed him that they were reviewing the amount of time he spent at the facility and the allegations of financial wrongdoing. The investigation concluded that all of the business manager's accusations were unfounded, except that Hinojosa had cashed checks from the inmate petty cash fund. Hinojosa now claims that that did not violate company policy, because he had permission to do so.

2

No. 10-40342

On August 3, Hinojosa participated in a conference call with CCA's Vice President and the two investigators to discuss the findings; the participants disagree about what exactly was said. Hinojosa testified that the Vice President suggested that it was time for him to retire, that he protested that he was not ready to retire, and that he was told that the business manager's allegations were unsubstantiated.[1] One investigator remembers telling Hinojosa that the gasoline reimbursement allegation was unsubstantiated, but the other denied speaking about any of the allegations. The Vice President, by contrast, recalls discussing Hinojosa's admission that he borrowed from the petty cash fund.

The Vice President then recalls stating that Hinojosa had stayed at the facility too long and that he "had lost confidence" in Hinojosa's ability to continue in his position. The Vice President also testified that, during the call, Hinojosa agreed to retire, but he denied ever telling Hinojosa that it was time to retire. None of the participants suggest that Hinojosa, during the call, was threatened with transfer or demotion.

That afternoon, Hinojosa met one of the investigators in a parking lot, where the investigator gave him a letter to sign memorializing the terms of his retirement. The letter recited the terms applicable to Hinojosa's stock options in CCA, noting that the options granted to him in 2004 would vest upon his retirement but that the options granted in 2005 and 2006 would be forfeited because Hinojosa was retiring too early.[2] Hinojosa read the letter and signed it voluntarily, although he told the investigator that "this is not right." CCA then hired a new warden, who was 52 years old.

---

[1] The district court found that the remark did not refer to the accusations in the Bellinger report.

[2] Had Hinojosa been fired, he would have lost all the stock options.

No. 10-40342

II.

Hinojosa sued CCA, alleging that he was discharged because of age, sex, race, and national origin discrimination in violation of title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Age Discrimination in Employment Act, 29 U.S.C. §§ 626 *et seq.* ("ADEA").[3]  Because Hinojosa was not fired, but rather resigned, his claim rests on the argument that CCA's actions constructively discharged him.  CCA moved for summary judgment on the ground that Hinojosa could not demonstrate working conditions so intolerable that he was forced to retire, so he could not establish a claim for constructive discharge.

III.

We review a summary judgment *de novo.  Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 991 (5th Cir. 2008).  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  "A genuine issue of material fact exists if the summary judgment evidence is such that a reasonable jury could return a verdict for the non-movant."  *Stover*, 549 F.3d at 991. We view the evidence in the light most favorable to the non-movant.  *Id.*

To make out a claim for constructive discharge, Hinojosa must show that his working conditions became "so intolerable that a reasonable person would have felt compelled to resign."  *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004).  The test is objective, asking whether a "reasonable employee" in Hinojosa's circumstances would have felt compelled to resign, not whether he actually felt compelled to resign.  *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297

---

[3] Hinojosa later abandoned his race discrimination claim.

4

No. 10-40342

n.19 (5th Cir. 1994).  Proof that the employer intended to create the intolerable conditions is not required, *see Jurgens v. EEOC*, 903 F.2d 386, 390 (5th Cir. 1990), although "manifestations" of that intent might be relevant to the inquiry, *id.* at 393 n.10.

We must therefore decide whether there is enough evidence in the summary judgment record to allow a reasonable jury to conclude that a reasonable employee in Hinojosa's position would have felt compelled to retire.  Courts have recognized seven factors tending to show the existence of intolerable circumstances, including:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not.

*Barrow*, 10 F.3d at 297.

Hinojosa's allegations do not implicate factors one through five.  Instead, he contends that the investigations of his conduct were unjustified and therefore constituted harassment and that he was threatened with discharge if he did not accept early retirement.  But there is no dispute that CCA was legitimately concerned about Hinojosa's behavior after receiving complaints and was justified in initiating the investigation.  Hinojosa falls back on the argument that the investigations were nonetheless pretextual because even after most of the allegations were found to be false, the Vice President continued to urge him to retire and stated that he had no confidence in Hinojosa.  Hinojosa sees in these comments a veiled threat to fire him if he did not voluntarily retire.

Even if a jury were to agree that the Vice President's remarks were a

5

veiled threat to fire,[4] the argument fails for three reasons.  First, it overlooks that the investigations did not discredit the Bellinger report's finding of widespread dissatisfaction among the employees serving under Hinojosa, nor did it excuse Hinojosa's mishandling of the employee who was sexually harassing the staff.  CCA thus had sufficient concerns about Hinojosa's behavior, even after the investigations, to justify a threat to fire him for poor performance.[5]  The possibility that CCA's dissatisfaction would lead to Hinojosa's firing was thus a legitimate risk that he had to bear, not part of an improper retirement offer making him worse off if he chose not to retire.

Second, Hinojosa was aware of the complaints, including the allegations in the Bellinger report.  Thus, when the Vice President stated that he had no confidence in Hinojosa and asked him to retire, Hinojosa had no reason to interpret those comments as anything other than a valid expression of concern about his performance.  He thus had no reason to assume that CCA was attempting to trump up the charges to force him to retire.

Third, "part of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast."[6]  Consequently, before agreeing to retire in response to what he believed to be a pretextual

---

[4] Because the witnesses gave different accounts of the conference call, it is possible for a jury to find that the Vice President did not even make these remarks.  In that case, however, Hinojosa had no reason to believe that he might be fired if he did not retire.  In the absence of such a threat, there is no possibility that his working conditions had become so "intolerable" that he had no choice but to retire.

[5] *See Henn v. Nat'l Geog. Ass'n*, 819 F.2d 824, 829-30 (7th Cir. 1987) (holding that threats to fire employees based on legitimate concerns about productivity do not constitute harassment, because "any threats made to these plaintiffs . . . were no greater than justified by their lack of sales").

[6] *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 481-82 (5th Cir. 2008) (quoting *Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 310 (5th Cir. 1987)), *abrogated in part on other grounds as stated in Donaldson v. CDB Inc.*, 335 F. App'x 494, 506 (5th Cir. 2009) (per curiam).

No. 10-40342

threat, a reasonable employee would have questioned his superiors about their intentions.[7]  Hinojosa thus should have tried to determine whether the Vice President's threat was legitimate or whether, instead, further investigation might have restored his confidence in Hinojosa's ability.  Instead, Hinojosa voluntarily signed the retirement letter only a few hours after the Vice President's remark.

Finally, Hinojosa points to the statement of one of the investigators that "I had to fire Joe" as evidence that the investigations were pretextual.  But that remark came after Hinojosa had retired, so it provides no evidence that CCA trumped up the investigation to coerce him into retiring.  Instead, it merely indicates the investigator's legitimate conclusions about the results of the investigation.

In short, there is no evidence supporting a conclusion that the conditions of Hinojosa's job were so intolerable that he had no reasonable choice but to retire.  Thus, he has failed to establish a genuine issue of material fact.  The judgment is AFFIRMED.

---

[7] *See Haley v. Alliance Compressor LLC*, 391 F.3d 644, 652 (5th Cir. 2004) ("[A] reasonable employee who genuinely felt these working conditions were upsetting to the point of intolerable would have attempted resolution of these concerns before choosing to quit . . . .").